# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. |
| *or identify the person by name and address)* | ) | |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| | |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

## ATTACHMENT A-6

### PREMISES TO BE SEARCHED

SUBJECT PREMISES 6 is located at 1515 W. Domingo Road, Fullerton, California, 92833, and includes attics, garages and storage areas, safes, lockers, briefcases, containers, trash bags, trash, and trash areas assigned to or part of the premises. SUBJECT PREMISES 6 is further described as a single-family ranch style residence located on the north side of W. Domingo Road, between Camino Loma and Camino Del Sol, in the City of Fullerton. A sign with the numbers "1515" is displayed on the south wall of the residence on a gray and white sign between the front door and the double door garage. The exterior of the residence is beige in color with a white garage door and white window trim. The entrance to the residence is through a pedestrian swing door on the south side of the building.

SUBJECT PREMISES 6 also includes a stand-alone guest house with a private entrance in the backyard. It is located in the North West corner of the property and is a ranch style in design. The entrance to the building is through French doors on the east side of the building.

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 331(a) (Introduction or Delivery for Introduction of a Misbranded Drug into Interstate Commerce), § 331(d) (Introduction or Delivery for Introduction of an Unapproved New Drug into Interstate Commerce), 18 U.S.C. §§ 542 (Entry of Goods By False Statements), 18 U.S.C. § 545 (Smuggling Goods into the United States), 18 U.S.C. § 1001 (False Statements), and 18 U.S.C. § 371 (Conspiracy) (the "Subject Offenses"), namely:

a.   Any unapproved new drugs, as explained in Paragraphs 13-15.

b.   Any drugs that are misbranded, as defined in 21 U.S.C § 352.

c.   Any packing materials and equipment or printed materials relating to the importation, manufacture, distribution, and/or sale of misbranded or unapproved new drugs, including labels, certificates of authenticity, retail commercial boxes, capsules, molds, packing materials, other documents, some of which may be labeled with the names Rhino, Orgazen, Casanova, King Kung, Tiger, Stag, Spanish Fly, libigrow, Black Panther, Black Stallion, Black Mamba, and Paparazzi.

d.   Machines used for manufacturing, packaging and encapsulating such as pill counters, encapsulation machines, blister packaging or similar machines.

1

    e. Components of misbranded or unapproved new drugs, including, but not limited to, capsules or pills, their containers, or ingredients;

    f. For the time period of January 1, 2015 to the present, records, documents, programs, applications, and materials relating to the importation of items from Hong Kong and other parts of China, or any other country, transportation of items which originated from Hong Kong and other parts of China, use of U.S. or private mail facilities to facilitate the importation or transportation of items which originated from Hong Kong and other parts of China, or any other country, relating to any misbranded item or unapproved drugs seized pursuant to this warrant.

    g. For the time period of January 1, 2015 to the present, records, documents, programs, applications, and materials relating to specifications, formulas, recipes, instructions, logs, manufacturing records, quality control records, and employee time sheets, relating to any misbranded or unapproved new drugs seized pursuant to this warrant.

    h. For the time period of January 1, 2015 to the present, records, documents, programs, applications, and materials relating to purchase orders, claims for payment of purchase orders, contracts, contract modifications, subcontracts, ordering agreements, memoranda and letters of intent, proposals, quotes and requests for quotes, lists of buyers and/or customers, invoices, notes, correspondence, inventory logs, delivery orders, memoranda of telephone

messages, certificates of sale, minutes of meetings, and corporate records, relating to any misbranded or unapproved new drugs seized pursuant to this warrant.

i.    For the time period of January 1, 2015 to the present, records, documents, programs, applications, and materials relating to records of payment, records of expenditures and receipts, cancelled checks, records for money orders, letters or credit, wire transfer orders, advisements of wire transfers, journals and other books of original entry, cash receipt journals, cash disbursement journals, sales journals, purchase journals, general ledgers, petty cash ledgers, accounts payable and accounts receivable ledgers, trial balances, credit card transactions, and company financial statements relating to any misbranded or unapproved new drugs seized pursuant to this warrant.

j.    For the time period of January 1, 2015 to present, records, documents, programs, applications, and materials relating to U.S. Customs entry forms 3461 (Entry/Immediate Delivery) and 7501 (Entry Summary), U.S. Customs Manifests of Goods, U.S. Customs declaration forms, seizure notices, records reflecting international payments, airway bills, bills of lading, packing lists, and delivery records.

k.    U.S. or foreign currency (that is, U.S. currency or U.S. currency equivalent in excess of U.S. $1,000, including the first $1,000 if more than $1,000 is recovered).

3

l.    Money orders, checks, and other monetary instruments made out to Nam Lee, Tuyet Diem Nguyen, Hasim Distribution Inc., Rainbow Natural Production Inc., Dalee Supply Inc., or Hasim Enterprise LLC.

m.    Records, documents, programs, applications, and materials relating to the identity of persons who work at SUBJECT PREMISES 2, 3, 4, and 5, occupy or lease SUBJECT PREMISES 1, 2, 3, 4, 5, 6 and 7, and who own or rent vehicles found at the SUBJECT PREMISES, detached structures, storage units or containers, including rent receipts or property or mortgage payments, telephone or cellular telephone billing statements, cancelled checks, utility billing statements, bank statements, and correspondence.

n.    Records, documents, programs, applications, and materials showing ownership, dominion, or control over each of the SUBJECT PREMISES, including utility statements and records, journals, records of occupancy, rental or lease agreements, letters, notes, and correspondence.

o.    Records, documents, programs, applications, and materials showing ownership, dominion, or control over storage or warehouse space or private storage areas, safety deposit boxes, including keys or access codes.

p.    Records, documents, programs, applications, and materials referencing communications with or shipments to or from pharmaceutical companies in Hong Kong or other parts of China.

4

   q. Records, documents, programs, applications, and materials consisting of or relating to communications regarding misbranded drugs with any representatives of the U.S. government or manufacturers of drugs.

   r. For the time period of January 1, 2015 to the present, records, documents, programs, applications, and materials tending to identify others involved in the conspiracy to smuggle or distribute misbranded drugs into/in the U.S., including communications regarding and images of misbranded drugs or their packaging.

   s. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

   t. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

   i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

   ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

   iii. evidence of the attachment of other devices;

   iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   v. evidence of the times the device was used;

   vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

   vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   viii. records of or information about Internet Protocol addresses used by the device;

   ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

6

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the

digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

   b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

   i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

   ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

   c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

8

was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling

9

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, the law enforcement personnel are authorized to: (1) depress the

10

fingerprints and/or thumbprints of Nam Hyun Lee ("Lee"), Tuyet Diem T Nguyen ("Nguyen"), and Michael Kim ("Kim"); and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, if Lee, Nguyen, or Kim are reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, in order to gain access to the contents of any such device.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

11

**AFFIDAVIT**

I, David J. Aspling, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Food and Drug Administration, Office of Criminal Investigations ("FDA OCI") located in San Clemente, California, and have been so employed since April 2015.  Prior to my employment with the FDA OCI, I was employed as both a SA and supervisory SA by the U.S. Department of Education's Office of Inspector General ("ED OIG") for approximately 17 years.  Prior to my employment with ED OIG, I was employed as a Customs Inspector for the United States Customs Service for approximately two years.  I am a graduate of the Federal Law Enforcement Training Center and Biola University.  As a SA with FDA OCI, I am responsible for conducting investigations involving criminal violations of the Federal Food, Drug, and Cosmetic Act ("FDCA), 21 U.S.C. § 321 *et. seq.*, as well as related Title 18 offenses.  I have conducted investigations involving the distribution of counterfeit and unapproved drugs, and misbranded and/or adulterated FDA-regulated products, including devices.  As a SA with ED OIG I conducted and supervised the conduct of numerous criminal investigations concerning violations of 18 U.S.C. and 20 U.S.C. § 1097.  These investigations often included allegations of conspiracy, wire fraud, mail fraud and false statements.  Through my education, training, and experience, I have become familiar with the manner in which these offenses are

1

committed and I have conducted numerous search warrants at a variety of locations, from small residences to large businesses.

2.     During this investigation, I have worked with SA Loan McIntosh from the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI").  SA McIntosh has been an agent with both HSI and the United States Customs Service ("USCS") since February 1995.  As an HSI SA, she has gained knowledge of Customs and Border Protection ("CBP") authority and laws and is responsible for enforcing federal criminal statutes involving, but not limited to, smuggling goods into the United States through illegal means.

3.     During my career in federal law enforcement, I have been involved in and supervised numerous investigations where computers were used to facilitate criminal acts and search warrants were executed to obtain evidence of criminal violations.

## II.   PURPOSE OF AFFIDAVIT

4.     This affidavit is made in support of applications for warrants to search the premises described below in paragraph 6 and Attachments A-1 through A-7, for the items listed in paragraph 8 and Attachment B, which constitute the fruits, instrumentalities, and evidence of violations of 21 U.S.C. § 331(a) (Introduction or Delivery for Introduction of a Misbranded Drug into Interstate Commerce); 21 U.S.C. § 331(d) (Introduction or Delivery for Introduction of an Unapproved New Drug into Interstate Commerce); 18 U.S.C. § 542 (Entry of Goods

2

By False Statements); 18 U.S.C. § 545 (Smuggling Goods into the United States); 18 U.S.C. § 1001 (False Statements); and 18 U.S.C. § 371 (Conspiracy). Hereinafter in this affidavit, the premises to be searched are referred to individually as "SUBJECT PREMISES" followed by its identifying number, and collectively as the "SUBJECT PREMISES."

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. PREMISES TO BE SEARCHED

6. Set forth below is a table identifying the location and type of premises of each of the SUBJECT PREMISES, along with corresponding paragraph numbers in the affidavit containing information about each premises:

| SUBJECT PREMISES NUMBER | LOCATION | TYPE OF PREMISES | Paragraph Numbers |
|---|---|---|---|
| 1 | A-1 Self Storage, 5081 Lincoln Avenue, Units 20, 26, 243, 247, 249, 250, 295, 303, 304, 307, Cypress, California 90630 | Business | 36, 37, 41-43, 51, 59-61, 69, 75, 89 |

| SUBJECT PREMISES NUMBER | LOCATION | TYPE OF PREMISES | Paragraph Numbers |
|---|---|---|---|
| 2 | 5241 Lincoln Avenue, #B3, Cypress, California 90630 | Business | 39-43, 48-49, 55, 57, 59, 69, 73, 75-79, 89 |
| 3 | 10430 Pioneer Boulevard, #3, Santa Fe Springs, California 90670 | Business | 46-47, 49-50, 52, 54, 56, 73, 91 |
| 4 | 5241 Lincoln Avenue, #B6, Cypress, California 90630 | Business | 73, 76-78, 82, 87 |
| 5 | 9930 Pioneer Boulevard, #103, Santa Fe Springs, CA 90670 | Business | 79, 81, 92 |
| 6 | 1515 W. Domingo Road, Fullerton, CA 92833 | Residence | 57-58, 63-64, 67-68, 70-71, 74, 80, 83, 90 |
| 7 | Wells Fargo Bank, Branch #04212, Safe Deposit Box #11, 13355 South Street, Cerritos, CA 90703 | Safe Deposit Box | 83 |

7.   Hereinafter in this affidavit, the premises to be searched are referred to individually as "SUBJECT PREMISES" followed by its identifying number, and collectively as the "SUBJECT PREMISES."

## IV.   ITEMS TO BE SEIZED

8.   The items to be seized, as described in Attachment B, constitute evidence, contraband, fruits, and/or instrumentalities of criminal violations of 21 U.S.C. § 331(a) (Introduction or Delivery for Introduction of a Misbranded Drug into Interstate Commerce); 21 U.S.C. § 331(d) (Introduction or

Delivery for Introduction of an Unapproved New Drug into Interstate Commerce); 18 U.S.C. § 542 (Entry of Goods By False Statements); 18 U.S.C. § 545 (Smuggling Goods into the United States); 18 U.S.C. § 1001 (False Statements); and 18 U.S.C. § 371 (Conspiracy).

## V. SUMMARY OF THE INVESTIGATION

9.     In July 2015, law enforcement received information from a cooperating defendant ("CS1") that an individual named Daniel Lee, also known as Nam Hyun Lee ("Lee"), was distributing male enhancement capsules under various brand names, which he marketed as dietary supplements.  CS1 stated that the capsules contained pharmaceutical ingredients used in Viagra and/or Cialis, which I know from my training, would make the capsules an unapproved new drug in violation of the FDCA.  In November 2016, CBP seized two kilograms of Tadalafil, which is the active pharmaceutical ingredient ("API") in Cialis, from a package sent from outside of the United States to Lee.  In March 2017, CBP seized 21 kilograms of Sildenafil Citrate ("Sildenafil"), which is the API in Viagra, from a package sent from outside of the United States to one of Lee's employees ("CS2").  CS2 told law enforcement that she/he assembled packaging containing capsules for Lee and provided law enforcement a capsule that tested positive for Sildenafil.

10.     In March 2017, CBP inspected a shipment containing packaging for male enhancement capsules and an email account was listed, along with Lee's contact information, on an invoice. Law enforcement conducted surveillance of a storage unit leased

5

by Lee and observed packaging material for male enhancement capsules. The storage unit leasing records listed an email account that is known to be Lee's email address. I obtained a federal search warrant for Lee's email account where I observed multiple emails in which Lee discusses receiving Sildenafil and Tadalafil, along with emails containing invoices of purchases by distributors of various capsules, including multiple capsules that had been purchased by law enforcement and later tested positive for Sildenafil and/or Tadalifil.

11. Further investigation identified multiple warehouse facilities, which have no business name signage, and another storage facility being utilized to manufacture, package, and store packaging materials and finished products that are later sold to regional distributors and places such as liquor stores, convenience stores, and gas stations locally and across the United States.

12. During the investigation, I identified the following facilities utilized by Lee:

a. SUBJECT PREMISES 1 is a storage facility business at which Lee utilizes approximately ten storage units to store his finished products prior to distribution.

b. SUBJECT PREMISES 2 is an office/warehouse site that houses Lee's business headquarters and where product is stored and distributed.

c. SUBJECT PREMISES 3 is a warehouse facility used for receiving and storing packaging materials and possibly conducting packaging as well.

6

d.    SUBJECT PREMISES 4 is an office/warehouse space, three doors down from SUBJECT PREMISES 2, used for storing packaging and products.

e.    SUBJECT PREMISES 5 is a warehouse facility, approximately one block from SUBJECT PREMISES 3, that appears to be utilized for assembling and packaging of products.

f.    SUBJECT PREMISES 6 is Lee's residence at which business and financial records have been found in the trash.

g.    SUBJECT PREMISES 7 is a safety deposit box opened by Lee at the same bank he holds several of his business accounts.

## VI.    BACKGROUND ON FDA AND FDCA

13.    The FDA is the agency of the United States Government responsible for enforcing the FDCA. Among the purposes of the FDCA is to ensure that drugs sold for administration to humans are safe, effective for their intended uses, and bear labeling containing only true and accurate information. The FDA's responsibilities include regulating the manufacturing and interstate distribution of drugs and dietary supplements.

14.    The FDCA defines a "drug" as, among other things (1) an article which is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animal, (2) an article (other than food) which is intended to affect the structure or any function of the body of man, or (3) articles intended for use as components of other drugs. 21 U.S.C. § 321(g).

7

15. The FDCA further defines a "new drug" as any "drug" the composition of which is not generally recognized as safe and effective among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs for use under the conditions prescribed, recommended or suggested in its labeling. 21 U.S.C. § 321(p).

16. An active pharmaceutical ingredient ("API") means any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or other animals. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect. 21 C.F.R. § 210.3(7)

17. The FDCA further defines "dietary supplement" as, among other things, a vitamin, mineral, herb or other botanical, amino acid, or other dietary substance for use by men to supplement the diet by increasing total dietary intake. 21 U.S.C. § 321(ff)(1). The product must be labeled as a dietary supplement, however, and it *may not* include an article that is approved as a new drug under the FDCA unless that article was marketed as a dietary supplement before such approval. 21 U.S.C. § 321(ff)(3)(B)(i).

**A. INTRODUCTION OF AN UNAPPROVED DRUG INTO INTERSTATE COMMERCE**

18. Under the FDCA, a "new drug" may not be introduced or delivered for introduction into interstate commerce unless FDA

has approved a New Drug Application ("NDA") or an Abbreviated New Drug Application[1] ("ANDA") with respect to the drug, or it qualifies for an exemption as an Investigational New Drug.[2]  21 U.S.C. §§ 355(a), 331(d).  The manufacturer of the new drug is required to submit information in the NDA or ANDA showing to FDA's satisfaction that its new drug is safe and effective for its intended use.  21 U.S.C. §§ 355(b)(1), (j), (l); 21 C.F.R. § 314.50.

19.  Under the FDCA, it is a prohibited act for a person to introduce or deliver for introduction into interstate commerce (or cause such violation) any new drug unless an approved application for that drug has been filed with FDA.  21 U.S.C. §§ 331(d), 355.

**B.   MISBRANDING**

20.  Under the FDCA, drugs can be deemed "misbranded" for various reasons, including, if the drug's "labeling is false or misleading in any particular."  21 U.S.C. § 352(a).

21.  Under the FDCA, drugs can be further "misbranded" if their labeling fails to bear adequate directions for use.  21 U.S.C. § 352(f)(1).  By regulation, "adequate directions for use," means "directions under which the layman can use a drug safely and for the purposes for which it is intended."  21 C.F.R. § 201.5.  It is impossible to have adequate directions for use, which include, among others, indications, dosages,

---

[1] Typically used for generics of existing, approved drugs.
[2] Typically used for clinical trials.

9

routes of administration, warnings, and side effects, without animal and clinical data that demonstrate the safety and efficacy of such drugs.

## C. FDA APPROVAL OF VIAGRA AND CIALIS

22. The FDA approved the drug manufacturer Pfizer's NDA for Sildenafil Citrate (under the trade name Viagra) on March 27, 1998 for the treatment of erectile dysfunction ("ED"). Pfizer has the patent protection on Viagra until 2020, but has agreed with Teva Pharmaceuticals to allow them to produce a generic version starting in 2017.

23. The FDA approved the drug manufacturer Eli Lilly's NDA for Tadalafil (under the trade name Cialis) on November 21, 2003 for the treatment of ED.

## D. CUSTOMS PROCEDURES AND SMUGGLING OF GOODS

24. Based upon my training and experience and my conversations with SA Loan McIntosh, I know the following:

a. 19 U.S.C. § 1499 provides the Department of Homeland Security ("DHS") border search authority that extends into any port of entry into the United States, including international airports. DHS, in conjunction with and through CBP, is responsible for administering the Tariff Act of 1930, as amended, as well as bilateral trade agreements between the United States and other governments. A portion of the responsibility includes the assessment and collection of duties, taxes, and fees on merchandise imported into the United States. When a shipment reaches the United States, the importer or consignee must file entry documents with CBP for the merchandise

10

to be entered. HSI investigates fraudulent importation practices with respect to CBP's collection of revenue and documents on imported merchandise.

      b.    When a shipment of goods reaches the United States, an importer files entry documents with CBP. The term "entry" is defined as the documentation (including commercial invoice, packing list, bill of lading, and CBP forms) required to be filed with the appropriate CBP Officer to secure release of imported merchandise from CBP custody.

      c.    Pursuant to 19 U.S.C. § 1484, the importer of record, or their authorized agent, must file certain entry documents with CBP concerning the goods. Entry documents must provide specific information relating to the imported goods. These documents, referred to as the "Entry Package," include invoices, visas, bills of lading, packing lists, and CBP Forms 3461 (Entry/Immediate Delivery) and 7501 (Entry Summary). CBP relies upon the documents filed in the entry package to assess the proper duties for the merchandise. In particular, the statements made on the invoices are relied upon by CBP to provide an accurate description of the merchandise, the sales price, the terms of sale, and all costs or services determined by law to be dutiable by CBP.

      d.    Pursuant to 19 U.S.C. § 1508, any owner, importer, consignee, importer of record, entry filer, or other party who imports, or knowingly causes any merchandise to be imported into the United States, shall keep records, including, but not limited to: statements, declarations, documents, and

electronically-generated or machine-readable data, which pertain to any such importation and which are normally kept in the ordinary course of business. The applicable regulation governing the record retention period states that these records must be maintained for a period of five years from the date of merchandise entry. Their records are often kept on a computer.

25. 18 U.S.C. § 542, makes it unlawful to attempt to introduce or introduce into the commerce of the United States any imported merchandise by means of false statements. 18 U.S.C. § 542.

26. 18 U.S.C. § 545, makes it unlawful for any person to knowingly and willingly, with the intent to defraud the United States, falsify documents presented to the customhouse. Additionally, the statute makes it unlawful to fraudulently and knowingly import or bring into the United States any merchandise contrary to law. 18 U.S.C. § 545.

## VII. PROBABLE CAUSE

27. FDA OCI and HSI agents, along with the Los Angeles Police Department ("LAPD") have been investigating a large-scale male enhancement smuggling, manufacturing, and distribution scheme based in Southern California since July 2015. The product, which is marketed as a dietary supplement, contains Active Pharmaceutical Ingredients ("API") including Tadalafil and/or Sildenafil but does not list the presence of API ingredients on the packaging. Moreover, members of the scheme do not have FDA approval to distribute the product, which constitutes a new drug.

28.   LAPD detectives were first made aware of this investigation through information provided by a cooperating source ("CS1") from a separate investigation out of the Eastern District of California.[3]   CS1 provided details concerning the names, some phone numbers, city addresses, and additional information about the 19 individuals who are involved in the manufacture and distribution of products marketed as dietary supplements but containing API.   Specifically, CS1 stated that Daniel Lee, of La Palma, California, with a telephone number of (213) 247-3348, was an individual who was involved in the importation, distribution, and manufacturing of male enhancement products marketed as "dietary supplements".   She/He stated that Daniel Lee makes illegal capsules and distributes nationwide.

## A.   INVESTIGATION OF OTHER SUBJECTS

29.   Further investigation of several of the 19 subject names from CS1 that LAPD provided to me and SA Loan McIntosh led to multiple search warrants and seizures of large quantities of capsules containing API and bulk powder seizures of Tadalafil, Sildenafil, Dapoxetine and/or their analogues.[4]   These investigations included the undercover purchases of 26 packages

---

[3] As detailed below, the information that CS1 provided to law enforcement has been corroborated through independent investigation and CS2.   In May 2016, CS1 was convicted of mail fraud after trial and sentenced to five years' imprisonment. She/he cooperated with law enforcement with the hope of receiving a sentencing reduction.

[4] Dapoxetine is a compound designed to treat premature ejaculation.   It has not been used as an active ingredient in any drug product whose NDA has been approved by the FDA.

13

of individual capsules, of varying brands, at five different convenience stores around Southern California.

## B.    INVESTIGATION OF LEE

30.    LAPD detectives and Intelligence Analyst Melinda Gottesman, Los Angeles Joint Regional Intelligence Center ("JRIC"), corroborated the identifying information of several of the names provided by the CS1 to include Lee, whose true name is Nam Hyun Lee.

31.    On January 5, 2016, I received information from a law enforcement official who was separately investigating Lee, that Lee may have storage units at a facility located at 5081 Lincoln Avenue, Cypress, California ("SUBJECT PREMISES 1").

32.    On April 17, 2016, I received telephone subscriber information from T-Mobile US, Inc., for the telephone number (213) 247-3348, which was provided by CS1 as Lee's telephone number; which listed Nam Lee as the subscriber and 5340 Kenwood Avenue, Buena Park, California as the subscriber address.

33.    On April 19, 2016, I responded to 5340 Kenwood Avenue, Buena Park, CA and observed an Asian male get out of a Toyota Sienna van, parked in the driveway, bearing California plate 7GKA567, and go to the front door of the residence.    A California Department of Motor Vehicles ("DMV") query, conducted on May 13, 2016, displayed the registered owner of the Toyota Sienna van, bearing California plate 7GKA567, as Nam Hyun Lee, 8251 La Palma Avenue, #376, Buena Park, California.

34.    On May 27, 2016, I responded to 8251 La Palma Avenue, #376, Buena Park, CA 90620 and saw that the address was a UPS Store and #376 was a P.O. Box inside the UPS Store.

35.    On November 15, 2016, I received information from U.S. Customs and Border Protection Officer ("CBPO") Hector Chaidez, that a package had been intercepted and seized at Los Angeles International Mail Facility in Torrance, California ("IMF"). The package contained two plastic bags, with a total of approximately 2 kilograms of white powder, concealed within what appeared to be food packaging, which tested presumptively positive for the presence of Tadalafil by the CBP Laboratory. The package was shipped from Hong Kong and was addressed to Daniel Lee, 8251 La Palma Avenue, #376, Buena Park, California 90620.   The package listed the addressee telephone number as (213) 247-3348, which had previously been provided by the CS1 and by T-Mobile as connected to Lee.   The customs declaration stated that the package contained health products and was valued at $10.   Based on my training and experience, I know that the value of two kilograms of Tadalafil is approximately $2,000.

36.    On December 7, 2016, FDA OCI SA Robert Iwanicki and I responded to A-1 Self Storage, 5081 Lincoln Avenue, Cypress, CA ("SUBJECT PREMISES 1").   At approximately 10:30 am, SA Robert Iwanicki and I, in an undercover capacity, went inside the storage facility and were provided a tour by the A-1 Self Storage employee on duty at the time.   We observed the Toyota Sienna van, bearing California plate 7GKA567, registered to Nam Hyun Lee, parked near the back row of storage units and several

Asian males standing near the van.  We observed multiple storage units in a row, some with doors open and some with doors closed, and numerous bags that contained boxes.  The bags were labeled with the name "Hasim" or "Stag" and some of the boxes inside of the bags were labeled "Rhino" and had the image of a rhinoceros. We observed the storage units that were open, specifically units #247 and #246, had shelving full of boxes that appeared to be male enhancement products.  SA Iwanicki took photographs of some of the bags and open units.  From one of the photos, I observed a white marker board, mounted on the end of one of the shelving units, had the following list written on it: "Rhino 7 3d (King); Tiger 9k (King); Rhino 8 (King); King Kong Blue (King); Casanova (King); Rhino 7 5k (King); Rhino 8 3d (King)."  I know from my training and experience that products with packaging containing the name "Rhino" are male enhancement products often marketed as dietary supplements but may be unapproved drugs because they are intended for use as drugs and contain API such as Tadalafil, Sildenafil and/or their analogues, such that they cannot lawfully be labeled as dietary supplements as explained in Paragraphs 14-17.

37.   On January 12, 2017, I received information from Scott Yeaman, Area Manager, A-1 Self Storage, confirming that Nam Lee currently leased 14 storage units at the A-1 Self Storage Facility located at 5081 Lincoln Avenue, Cypress, CA 90630 including units 246 and 247 ("SUBJECT PREMISES 1").

38.   On January 13, 2017, while conducting surveillance at the UPS Store located at 8251 La Palma Avenue, Buena Park, CA

90620, I observed the Toyota Sienna van, bearing CA plate 7GKA567, registered to Lee, driven by an Asian male pull into the lot and park. I observed the male driver sitting in the vehicle talking on a cell phone for some time. Later, I observed the male driver get out of the van, walk inside the UPS Store, pick up a package and carry it to the van. I reviewed photos I took of one of the boxes which revealed a tag with the number "376" on it which is same number as the mailbox unit at the UPS Store. 8251 La Palma Avenue, #376, Buena Park, CA 90620 is the address to which two shipments of bulk powder API were addressed that were seized by CBP

39. On January 25, 2017, SA Darryl Polk (FDA OCI) and I conducted surveillance at 3143 W. Paso Robles Drive, Anaheim, CA because this was an address that was linked to Nam Hyun Lee in a law enforcement database that searches public records. We observed a vehicle leave the residence, with two Asian females inside, and stop at a business address located at 5241 Lincoln Avenue, #B3, Cypress, California ("SUBJECT PREMISES 2"). SA Darryl Polk informed me that he observed the door to unit #B3 was open and inside there were multiple cardboard boxes and shelving. SA Darryl Polk also informed me that he observed a bag on the floor with the word "Stag" written on it.

40. I reviewed the California Driver License photo for Nam Hyun Lee. On January 31, 2017, I observed Lee driving the Toyota Sienna van (7GKA567) at 5241 Lincoln Avenue, #B3, Cypress, California ("SUBJECT PREMISES 2"). I also observed Nam Hyun Lee walk from the Toyota Sienna van (7GKA567) into #B3.

17

41. I conducted surveillance, along with FDA OCI SAs Polk and Iwanicki, at various times between January 31, 2017 and July 26, 2017 at SUBJECT PREMISES 2. Collectively, we observed the following as reported to me by SAs Polk and Iwanicki or seen personally. We observed multiple Asian males and females, on multiple occasions, take cardboard boxes and blue bags, to and from various vehicles and to and from SUBJECT PREMISES 2. Some of the bags had the word "Hasim" and others the word "Stag" in yellow lettering. We observed items taken from SUBJECT PREMISES 2 and placed in the trash dumpster, which we retrieved and found packaging for products labeled "Rhino 69," "libigrow," and "Spanish Fly." Standing in a public area, we viewed, and photographed, inside SUBJECT PREMISES 2 and observed a large room, off the front office, that contained multiple shelving units, large quantities of blue bags and party style gift bags, and long tables with a laptop computer and product packaging boxes nearby. We observed an Asian female driver leave SUBJECT PREMISES 2 and drive inside the gated area of SUBJECT PREMISES 1.

42. In March of 2017, I received information about a potential Cooperating Source ("CS2")[5] who had contacted the Drug Enforcement Administration ("DEA") after receiving a notice that a package addressed to him/her had been seized.[6] On March 14,

---

[5] CS2 has a prior DUI conviction.

[6] On March 30, 2017, I received information, provided by FDA-OCI SA Daniel Whittemore, concerning a review of items seized by HSI at the FedEx Memphis, Tennessee hub. The

2017, HSI SA Loan McIntosh and I interviewed CS2.   CS2 informed us he/she had been working for Lee since 2015 out of his/her home.   CS2 stated that Lee, or Lee's employees, provided CS2 with capsules containing powder and packaging materials and tools such as a glue gun.   CS2 stated Lee's business, where he/she picks up the materials and drops off the completed packaged products, was located at SUBJECT PREMISES 2.   CS2 stated that he/she had received packages via mail or delivery service for Lee and then provided the packages to Lee.   CS2 stated that Lee also had approximately 13 to 14 storage units located at SUBJECT PREMISES 1.   CS2 stated there were a lot of other people doing the same kind of work he/she does for Lee from their homes.   CS2 stated he/she can complete as many as 4,800 individual capsule packages per day and is paid $.10 per completed package.   CS2 stated that many people came to Lee's business to purchase the finished, packaged product from him. SA McIntosh showed CS2 the California Driver's License photo of Nam Hyun Lee and CS2 identified the individual in the picture as the individual he/she knows as Lee.   CS2 showed us packaged products and materials for "Rhino 69" and "Orgazen" as well as the blue bags with the names "Hasim" and "Stag" written on them. During the interview, CS2 provided us with a package labeled "Rhino 8" containing a capsule.   On March 16, 2017, the CBP Los Angeles Laboratory tested the powder contents of the capsule

---

information included details of a seizure, on or about November 23, 2016, of approximately 21 kilograms of Sildenafil, addressed to CS2 and shipped from HANGZOU ZHINGING TRADING Co. LTD.

provided by CS2 during the interview and presumptively identified the presence of Sildenafil.

43. On February 10, 2017, SA Darryl Polk and I responded to five different retail markets in Orange County, several in close proximity to SUBJECT PREMISES 1 and SUBJECT PREMISES 2, and observed various dietary supplement male enhancement products displayed for sale with "Rhino" in the product name, including "Rhino 69."

44. On March 24, 2017, HSI SA Loan McIntosh and I, along with CBP officers, reviewed the contents of a shipment connected to Lee that arrived at the Long Beach Seaport. The shipment was addressed to Dalee Supply. The shipment contained 295 cartons of packaging materials for products including "Black Panther," "libigrow," "Black Stallion," and "Black Mamba" as well as bar code stickers in a box labeled "Rhino 69." From the labeling, each of these appeared to be packaging for male enhancement products. Later, I reviewed entry documents for this shipment and observed the invoice listed the buyer as "Dalee Supply Inc.; ADD: 8251 La Palma Ave #376, Buena Park, CA 90620; ATT: Daniel Lee; TEL: 2132473348; Email: hasimdalee@gmail.com". The invoice listed the supplier as "DooHoo International Printing Co. Ltd."

45. On March 30, 2017, FDA OCI SAs McMillan, Iwanicki and I conducted undercover purchases of 31 male sexual enhancement products suspected to contain API at five different locations in Orange County. The product names included "Rhino," "Black Panther," "KingKung," "libigrow," and "Paparazzi" among others. I submitted the products to the FDA Forensic Chemistry Center

("FCC") for testing.  On June 19, 2017, I received the analysis results from FCC concerning the purchased products.  I reviewed the results and learned that every product brand purchased and tested except one tested positive for the presence of Sildenafil, Tadalafil, or Dapoxetine.  Many of the capsules contained more than one API.

46.  On March 31, 2017, I received information from SA McIntosh that the cargo shipment we previously examined on March 24, 2017 to Dalee Supply, Inc., was directed to be delivered to Hasim Distribution – warehouse, 10430 Pioneer Blvd Unit 3, Santa Fe Springs, CA 90670, 213-864-9110 ("SUBJECT PREMISES 3").

47.  On April 3, 2017, HSI SA Loan McIntosh informed me she received a text communication from the CS2, on March 15, 2017, indicating he/she had picked up capsules from SUBJECT PREMISES 3 that same day.

48.  On April 3, 2017, I reviewed public records on the California Secretary of State website, "Business Search" section in an attempt to locate business associated with Lee.  During my review I observed the following:

a.  A Statement of Information, filed June 29, 2016, California Corporate Number C3917841, listing Hasim Distribution, Inc. as the corporate name, 8251 La Palma Avenue, #376, Buena Park, California 90620 as the street address for the principal executive office, and Nam H Lee as the Chief Executive Officer (CEO), Secretary, Chief Financial Officer (CFO), Director, and Agent for Service of Process.

b. A Statement of Information, filed October 19, 2016, California Corporate Number C3952788, listing Rainbow Natural Production, Inc. as the corporate name, 8251 La Palma Avenue Unit 376, Buena Park, California 90620, as the street address for the principal executive office, and Nam Hyun Lee as the CEO, Secretary, CFO, Director, and Agent for Service of Process.

c. Statement of Information, filed November 16, 2016, California Corporate Number C3959453, listing Dalee Supply, Inc. as the corporate name, 8251 La Palma Avenue #376, Buena Park, California 90620 as the street address for the principal executive office, and Nam Hyun Lee as the CEO, Secretary, CFO, and Director.

d. A Statement of Information, filed February 06, 2017, 12-Digit Secretary of State File Number 201702510413, listing Hasim Enterprise, LLC as the limited liability company name, SUBJECT PREMISES 2 as the street address of the principal office, and Nam Hyun Lee as a manager or member.

49. On April 5, 2017, SA Polk, SA McIntosh and I interviewed CS2 again. During the interview, CS2 discussed, among other things, SUBJECT PREMISES 3. CS2 described SUBJECT PREMISES 3 as a large warehouse full of a lot of packaging materials. CS2 stated there is a large roll-up door that uses a chain to open it and there is a pedestrian door next to the roll-up door. CS2 stated he/she has seen the capsules brought to SUBJECT PREMISES 2 by a Korean man (NFI), in boxes and bags. CS2 stated that Lee recently went to a trade show in Las Vegas,

Nevada and received lots of orders for his products. CS2 stated that Lee ships his products all over the United States and that UPS comes to SUBJECT PREMISES 2 every day at 11:00 a.m. and FedEx comes every day at 4:00 p.m. to pick up orders for other states.

50. On April 6, 2017, SAs Iwanicki, Polk, and Cindy Niu responded to SUBJECT PREMISES 3 with CS2. CS2 pointed to a roll up garage door, the farthest roll up door to the left when the viewer is facing the back side of the building, indicating it was the door he/she had seen inside of. Nearby was a pedestrian door labeled as "shipping." CS2 stated there was a large room inside that joins to the neighboring roll up garage door to the right. This location is where CS2 saw large amounts of packaging materials inside and picked up capsules according to the April 5, 2017 interview. Later during surveillance at SUBJECT PREMISES 3, on April 18, 2018, a large silver metal packaging machine and multiple cardboard boxes with labels on them, stacked on shelving units were seen inside SUBJECT PREMISES 3.

51. On April 10, 2017, I received copies of rental agreements and related account documents for Lee for the following unit numbers at SUBJECT PREMISES 1: 10, 27, 191, 241, 243, 246, 247, 249, 250, 288, 303, 307, 922, 924, and 926. I reviewed the rental agreements for each unit and observed that each rental agreement listed Nam Lee as the tenant, (213) 247-3348 as a phone number, and namlee52@gmail.com as an email address. I observed that many of the unit accounts had a State

23

Farm "Certificate of Liability Insurance" document that listed the insured as "Hasim Distribution, Inc., Dalee Supply, 8251 La Palma Ave #376, Buena Park, CA 90620." I observed Nam Lee vacated unit 27 on February 24, 2017, unit 241 on February 21, 2017, and unit 288 on March 22, 2017.

52. On April 18, 2017, at approximately 1:14 p.m., SA Polk, acting in an undercover capacity, walked up to the open pedestrian door at SUBJECT PREMISES 3 and spoke with an Asian male inside. While speaking to the male inside, SA Polk observed a warehouse with many boxes, some type of machine, and a stack of bags with the word "Stag" on them.

53. On June 7, 2017, CBP Mail Specialist Sue Carroll, informed me that a package addressed to Daniel Lee containing approximately 1.84 KG of powder Tadalafil, presumptively tested by CBP, had been intercepted. The package was addressed to the UPS location at 8251 La Palma Avenue, #376, Buena Park, California. The customs declaration stated that the package contained glass bottles and was valued at $5.00. Based on my training and experience, I know that the value of 1.84 kilograms of Tadalafil is approximately $1,840. On June 13, 2017, I retrieved and reviewed the seized package, addressed to Daniel Lee, from CBP for entry into FDA OCI evidence.

54. On June 15, 2017, I reviewed emails for the accounts hasimdalee@gmail.com and namlee52@gmail.com, believed to belong to Lee. The emails were obtained pursuant to a federal search warrant that I obtained and served on Google Inc. on May 25, 2017. During my review I saw the following relevant emails:

24

a.   Emails dated between November 11, 2016 and November 30, 2016, from Michael Kim at hasimmikek@gmail.com to Randy Wind at randy@windgrp.com, copied to Daniel Lee at hasimdalee@gmail.com, subject line "Re: To: Daniel Lee & Sue Quan // RE: 5241 Lincoln, B3". The email conversation stated "Randy, Attached is completed application. Please complete missing items in LOI. As discussed on our meeting, we will be using the location to store and distribute printed materials. We are also willing to deposit additional months of security deposit if need be. Please review and reply back to us." I reviewed the portion of the email conversation, dated November 11, 2016, from Nam Lee at hasimdalee@gmail.com to randy@windgrp.com and observed it stated "This is Daniel Lee with Quan Sue. Do you have space at 5241 Lincoln? Can you reply? That is space for me. I left message yesterday also. Regards, Daniel Lee." I reviewed the attachment to the email conversation titled "Hasim Distribution Application.pdf" and observed documents such as "Agreement and Consent," "Lease Application, Credit & Financial Statement," and "Letter of Interest (LOI) to Lease" bearing such information as "Nam Hyun Lee" and his corresponding social security number, date of birth and driver license number, and "Hasim Distribution, Inc., 8251 La Palma Ave., #376, Buena Park, CA 90620, hasimdalee@gmail.com, (213) 247-3348." Several of the documents have signatures near the name "Nam Hyun Lee."

b.   An email, dated August 15, 2016, from Nam Lee at hasimdalee@gmail.com to Youngsomeherbs@gmail.com with the

subject as "Hasim Distribution."  I observed the email stated, in part, "[t]hank you for your reply for my text, My name is Daniel Lee. Hasim distribution Inc. is my new company, dba Dalee supply.  I visited last time, and showed my products in the car. I am moving 1,000,000 capsules/month.  I want to make male sexual enhancements products, with 100% natural formula.  I used make that products by Crown at Santa Fe Springs.  I have formula, if you can make, I will bring formula with deposit."

      c.    A July 3, 2016 email from Nam Lee at namhyunlee@gmail.com to Nam Lee at hasimdalee@gmail.com, subject "tainted list," with a link to the FDA website at http://www.fda.gov/drugs/resourcesforyou/consumers/buyingusingme dicinesafely/medicationhealthfraud/ucm234539.htm.  On August 30, 2017, I reviewed the link and saw that the link routed to an FDA webpage titled "Tainted Sexual Enhancement Products" that listed various products with links to public notifications concerning the dangers of the hidden drug ingredients found in the products.  I observed the list had products with names such as "Rhino," "Orgazen," "Black Mamba," and "Black Panther" with corresponding public notices dated prior to July 3, 2016.

      d.    An email conversation between Lee at namlee52@gmail.com and Rick Huang at Service07@uniwisead.com with the subjects of "Re: To Mr Daniel ==Quote for Tada, Valde,Silde&Dapo" and "Re:The way for safe custom clear."  In a March 8, 2016 email, Rick Huang stated to Lee "[r]egarding the safe way for passing customs, We will change the product name on the label and make it easier to pass the USA customs. We will

use FedEx just like we always do. Pls see the price below first:
Tadalafil 10kg . . . 465USD/kg . . . Sildenafil 5kg . . .
130USD/kg . . . Dapoxetine hydrochloride 2kg  . . . 1050USD/kg
. . . Vardenafil 5KG  . . . 1120USD/kg."  In a March 14, 2016,
Lee stated to Rick Huang "Hi, Thank you for letter, I well
received, I am thinking the way that custom clear. I will
contact you soon. Daniel Lee."  In a March 14, 2016 email from
Rick Huang to Nam Hyun Lee, Rick Huang stated in part "Hi,
Daniel, Good day. We all konw [sic] it's difficult to do the
custom clear by their real name.  So we will change product name
on the label and send the product to you under the name of
"Granular Amino Moulding Compound" by FedEx courier.  That's a
safe way to pass customs just like we always do. We can make Low
open invoice to reduce import duty."

        e.    A December 29, 2015 email conversation between
Lee at namlee52@gmail.com and Rick Huang at
Service07@uniwisead.com with the subject lines "Re: Attn:
Purchasing – tadalafil/HighQuality – Uniwise Company," and "Re:
Tadalafil" and "Packing pictures."  In the email, Rick Huang
states "Dear Daniel, Thanks for your email. Our package is
security to pass the customs. we will change the name on the
label and make it easier for international delivery. We will
pack the product with Aluminum Foil Bag inside and carton
outside."

        f.    An August 9, 2016 email from Lee at
hasimdalee@gmail.com to Sue at quan.sue@gmail.com with the
subject "Invoice.pdf."  The email contained an attachment titled

"Proforma Invoice" and contained the following information in part: "Date: Aug.08, 2016", "HANGZHOU UNIWISE INTERNATIONAL CO., LTD.", "No. WIN160810," "Shipping Port: Hangzhou," "Destination: Long beach," "Shipment: Sent by FedEx 2times within 10-15days," "Origin: China," "For and on behalf of the buyer Daniel Lee"

| Item and description | Quantity KG | Unit price USD/KG | Amount USD |
|---|---|---|---|
| Sildenafil;99%min | 10 | 140 | 1400.00 |
| Mirodenafil;99%min | 1 | 1500 | 1500.00 |
| Dapoxetine hcl;99%min | 1 | 1075 | 1075.00 |
| Your Balance | | | 2090.00 |
| Total | 12 | | 1885.00 |

g.   Emails, dated between June 16, 2016 and July 1, 2016, between Lee at namlee1958@gmail.com and Rick Huang at Sevice07@uniwisead.com with the subject "Re:Recommendation."  In the emails, Rick Huang states, in part, "Hi Daniel, Regarding to the best performance.  I recommend the mixed composition used Sildenafil as base.  There is two dosage for mixing.  One is 180mg Sildenafil mixed with 40mg Tadalafil and another is 100mg Sildenafil mixed with 30mg Tadalafil.  The first is more powerful than the second.  But it depends on different people's physique.  Occidental people suit for the first dosage and Asian suit for the second dosage.  Also, other product like

Mirodenafil and Vardenafil can perform better when mixed with Sildenafil."

h.     An email dated October 18, 2015, between Lee at namlee52@gmail.com and Mina at mina@nutrisouls.com with a subject of "Re: tadalafil –from Mina."  In the email Mina at mina@nutrisouls.com, states in part "Dear Daniel Lee, Good Day! This is Mina from XI'AN YIYANG BIO-TECH CO., LTD., China. I have sent quotation for tadalafil to you on Alibaba before. Any news about this? . . . tadalafil Price: USD330.00/kg(FOB Xi'an, 100kg)."  On October 19, 2015, Lee responds "Hi, Custom clear? Daniel," to which Mina responds "We usually use the name of "saw palmetto extract" for customs declarations, all are OK!"

i.     Emails dated between July 23, 2016 and February 21, 2017, containing exchanges between Lee and employees of Doohoo Printing Co., LTD, in China.  Most of the emails contained invoices for orders, of large quantities, of items such as 3D cards, 3D boxes, blister packs, tubes/plastic bottles, colored aluminum caps, paper boxes, posters, and Rhino 69 bar codes stickers.   I reviewed an email, dated February 21, 2017 to Lee from young@doohoo123.com with the subject of "DH-1737 Account Statement 20170222". The email had a five-page attachment listing invoice order dollar amounts and payment dates between March 30, 2016 and February 21, 2017.  I reviewed page five of the attachment and observed under the column heading "Total Order Amount" was listed "$1,092,261.5" and under the column heading "Received Amount" was listed "$1,001,437.83."

j.    A November 18, 2016 email from Michael Kim at hasimmikek@gmail.com to Trent Peterson at trent.peterson@cbre.com with Daniel Lee at hasimdalee@gmail.com on the "cc" line, with a subject of "Proposal for Lease, Pioneer Warehouse Revised."   The email stated "Trent, Attached are signed agreement for revised lease."   I reviewed both attachments to the email which had signatures attributed to Nam Lee.   The attachment titled "P11-Biven-10430 Pioneer-Unit3-Hasim Distribution-1-Signed Updated.pdf," dated November 17, 2016 stated "RE: Proposal to Lease 10430 Pioneer Boulevard, Unit 3, Santa Fe Springs, California 90670 [SUBJECT PREMISES 3];" "Lessee: Hasim Distribution, a California corporation," "Premises: 10430 Pioneer Boulevard, Unit 3, Santa Fe Springs, California; an approximately 5,227 square foot portion of a larger multi-tenant industrial building within the Town Center Business Park"; "Term: Thirty-Six (36) months"; "Use: The Premises shall be used for warehouse and storage."; and "Commencement: January 1, 2017."   The rent was listed as "$3,397.55" per month.

k.    A November 21, 2016 email from Michael Kim at hasimmikek@gmail.com to Trent Peterson at trent.peterson@cbre.com, with Daniel Lee at hasimdalee@gmail.com on the "cc" line, stating "Trent, We import & distribute printed materials from China and Mexico. We currently have 15-10X30 storage units. We are looking to consolidate all the locations so we can better manage."

1.    An email conversation from November 17, 2016 to December 14, 2016, between Chris Han at chris@shcustomsbroker.com, Michael Kim at hasimmikek@gmail.com, and Lee at hasimdalee@gmail.com.  On December 5, 2016, Chris Han stated "Good afternoon Michael, do you have delivery location for 728 ctns? Freight is available now … Please check and let us know."  On December 14, 2016, Michael Kim responded "Chris, Our address for delivery is 10430 Pioneer Blvd., Santa Fe Springs, CA 90670 [SUBJECT PREMISES 3]. Please call us 30 minutes ahead at 213-864-9110 so we can meet the driver there.  Regards, Michael".

55.    On August 11, 2017, I conducted an online query and located information concerning Otsuka Investments on the website www.arivify.com.  I observed the website listed "Otsuka Invest" as the owner of "5241 Lincoln Ave Cypress CA 90630" (SUBJECT PREMISES 2).  That same day, I reviewed financial records for accounts linked to Lee and his companies.  I observed a check, dated March 27, 2017, paid to the order of Otsuka Investments LLC, in the amount of $3,236.20, drawn upon Wells Fargo account #7580060593, with "Hasim Distribution, Inc., 8251 La Palma Ave., #376, Buena Park, CA 90620, 213 347 3348" listed on the check header.  I observed the memo line stated "5241 Lincoln Ave., #B3" (SUBJECT PREMISES 2).

56.    On October 20, 2017, at approximately 8:15 am, I responded to SUBJECT PREMISES 3 and observed a sign on the pedestrian door that stated "J.K. Fab" "Hasim" "10430-3."

31

57.    On November 3, 2017, I conducted a law enforcement
database query to locate possible residence locations for Lee.
The query indicated the most recently reported address for Nam
Hyun Lee as 1515 W. Domingo Rd., Fullerton, CA 92833 ("SUBJECT
PREMISES 6").  The listed owner of the property was B & J
Distribution Inc., with a purchase date of April 26, 2017, and a
purchase price of $1,200,000.  I conducted an online query of B
& J Distribution Inc. which listed, on www.Bizapedia.com, Bumjin
Kim, 5662 Lime Avenue, Cypress, California, as the registered
agent and a California State filing number of C4005271.  I
conducted an online query of the California Secretary of State
website and found filing number C4005271 corresponds to B & J
Distribution Inc., and Bumjin Kim is listed as the registered
agent.  During surveillance, the driver of a vehicle registered
to Bumjin Kim has been seen walking into the office door of
SUBJECT PREMISES 2.  In addition, I have reviewed bank records
showing payments totaling at least $773,969 from Lee and/or his
companies to Bumjin Kim and/or B&J Distribution, of which
$670,000 purchased a cashier's check for the purchase of SUBJECT
PREMISES 6.  In addition, I reviewed bank records showing seven
cash deposits into B & J Distribution's Wells Fargo account
#1661523553, on June 8, 2017, totaling $50,400, the same day
escrow closed on SUBJECT PREMISES 6.  There were five deposits
of $9,000 each, one deposit of $1,000, and one deposit of
$4,400.  A cashier's check was purchased, by Bumjin Kim, from
the same Wells Fargo account, on June 8, 2017, for $50,400
payable to Inter Escrow Inc.  During review of the deposits, I

32

identified at least $11,615.00 in money orders, on different dates and from different vendors, payable to Bumjin Kim, with Lee listed as the purchaser.

58.   On November 3, 2017, at approximately 9:18 a.m., I responded to SUBJECT PREMISES 6 and observed a Toyota Avalon bearing California license plate 7VZK043, registered to Nam Lee, parked in the driveway.

59.   On November 3, 2017, at approximately 11:38 a.m., I responded to SUBJECT PREMISES 2 and observed several Asian males walking in via the office door.  I observed the pedestrian door to the warehouse was open and the Toyota bearing California license plate 7GKA567, registered to Lee, was parked nearby.  At approximately 11:45 a.m., I observed a previously identified Acura (7WEP826) pull out of the parking lot for SUBJECT PREMISES 2 and park in the cul-de-sac.  I observed two Asian males (a driver and a passenger) get out of the Acura (7WEP826) and retrieve a plastic bag from the trunk/rear lift gate of the vehicle.  I observed the plastic bag appeared to contain boxes similar to others seen during the investigation at SUBJECT PREMISES 1.  I observed the males walked toward SUBJECT PREMISES 2 carrying the plastic bag with the boxes and then the driver returned to the Acura (7WEP826) and parked it near the warehouse door to SUBJECT PREMISES 2.

60.   On December 11, 2017, at approximately 9:15 a.m., SA Polk and I went to SUBJECT PREMISES 1 to review video footage from the business security camera system.  Steve Krampach, the location manager, provided me with activity log printouts for

specific dates and specific storage unit numbers.   Mr. Krampach
told me that Lee had vacated some of his units recently and was
currently renting units 10, 243, 247, 303, and 307.
Additionally, Mr. Krampach informed me that a female by the last
name Nguyen, later identified as Tuyet Diem T Nguyen ("Nguyen"),
had recently rented units 191, 249, 250, 26, 278 and appeared to
be connected to Lee and his business.   During our review of
security footage, SA Polk and I observed individuals and
vehicles accessing specific units, including units 26, 191, and
291, large quantities of male sexual enhancement products inside
of open storage units, individuals moving products previously
observed on this case, and Nguyen come into the office looking
to rent additional units and requesting a discount on the units.

61.   On December 13, 2017, Brian Darmas, Area Manager,
Caster Properties, Inc., A-1 Self Storage, informed me that
Nguyen was now renting units 26, 191, 249, 250, and 278 at
SUBJECT PREMISES 1.

62.   On September 7, 2017, Mr. Krampach, A-1 Self Storage,
provided me lease and payment records indicating Lee was
currently renting units 243, 247, 303, and 307 and vacated units
10, 27, 191, 241, 246, 249, 250, 288, 922, 924, and 926.   The
records showed that Nguyen was currently leasing units 20, 26,
249, 250, 295, and 304 and vacated units 191, 278, 291, 926, and
927.   The records showed that approximately $9,371 in cash
payments and approximately $8,573 in check payments had been
made for Nguyen's leased units.   I reviewed a copy of a recent
payment to A-1 Self Storage and observed a check, #13131, dated

34

August 8, 2018, paid to the order of A1 Storage, in the amount of \$4,003, drawn upon Wells Fargo account #7580060593, with "Hasim Distribution, Inc., 8251 La Palma Ave., #376, Buena Park, CA 90620, 213-347-3348" listed on the check header. I observed the memo line stated "#307, #249, #250, #247, #26, #20." I also observed the records showed that Nguyen leased units 291 and 926 on December 11, 2017, the same day SA Polk and I were present at A-1 Storage and observed Nguyen attempting to rent additional units.

63. On December 13, 2017, I obtained certified copies of property records from the Orange County Clerk-Recorder for the real property located at SUBJECT PREMISES 6. I observed among the documents a "Grant Deed," recorded on June 9, 2017, indicating the property was granted to B & J DISTRIBUTION INC., a California Corporation. I observed a "Deed of Trust and Assignment of Rents" document, recorded on June 9, 2017, listing the address for B & J DISTRIBUTION INC. as 5662 Lime Avenue, Cypress, California. The document was signed by Bumjin Kim, CEO on behalf of B & J DISTRIBUTION INC. I observed a "Grant Deed," recorded on November 11, 2017, conveyed and quitclaimed the property from B & J DISTRIBUTION INC. to JY Consulting & Trading, LLC with the same address of 5662 Lime Avenue, Cypress, California and signed by Bumjin Kim, President. On December 14, 2017, I conducted an online query of https://www.corporationwiki.com/p/2zxmqn/jy-consulting-trading-llc and observed the company JY Consulting & Trading, LLC. is listed with an address of 5662 Lime Ave., Cypress, California,

35

California State ID: 201728510236, filed Thursday, October 5, 2017, with Bumjin Kim listed as a member.

64.   On January 11, 2018, I went to Lawyers Title in Irvine, California and spoke with Glenn Awerkamp, Vice President, Title Operations Manager, concerning Title Order No.: 217570611 & Escrow No.: T-021723-AK reference the real property located at SUBJECT PREMISES 6. Awerkamp informed me that "AK" in the escrow number refers to Amy Kim who works for Interescrow, the company that handled escrow for this property transaction. Awerkamp informed me the property sold for $1.2 million, the purchaser, B & J Distribution, Inc., paid a $900,000 down payment, and the payoff for the seller's loan was approximately $617,000. In addition, the sellers, In Chul Han and Won Jung Han, Trustees of the Han Family Revocable Trust Dated August 14, 2003, financed a $300,000 carry back loan to the buyer B & J DISTRIBUTION, INC., which was the only loan in the transaction. Awerkamp informed me that Lawyers Title did not know the source of the $900,000 down payment as those funds would have gone into the escrow account and Interescrow would have that information.

65.   On May 15, 2017, three checks totaling $670,000 were deposited into B & J Distribution Inc., Wells Fargo Bank Account #1661523553. Two checks totaling $200,000 were from Wells Fargo Bank, Remitter: "Nam Hyun Lee," paid to the order of B&J Distribution Inc. The other deposit item was a Bank of Hope cashier's check, Remitter: "Dalee Supply Inc." for $470,000 paid to the order of B & J Distribution Inc.

66.   On June 6, 2017, Bumjin Kim/B&J Distribution withdrew $670,000 from B&J Distribution Wells Fargo Account #1661523553, to purchase a cashier's check paid to Inter Escrow.

67.   On January 23, 2018, I received an email from Lacey Tinoco, FSA Data Analyst/Messenger, United States Marshals Service ("USMS"), Asset Forfeiture Unit, containing a link to a lien report concerning SUBJECT PREMISES 6.  The report, among other information, contained a copy of a grant deed, dated December 29, 2017 and recorded January 2, 2018, granting the property at SUBJECT PREMISES 6 from JY Consulting & Trading, LLC to Dalee Supply, Inc.  SUBJECT PREMISES 6 was then gifted from Dalee Supply, Inc., via grant deed, recorded on January 26, 2018, to Lee's three children "Lemuel Lee 40%, Yoon Ji Lee 30%, and Yoon Jung Li 30%, all of whom are siblings, all as tenants in common."

68.   On January 21, 2018, at approximately 7:40 a.m., SA Zeva Pettigrew responded to SUBJECT PREMISES 6 and observed the Toyota (7VZK043) and a Honda CRV, bearing CA license plate 6WZG790, registered to The Dieu Dao Fam Liv Trust, or Tuyet Nga Nguyen, parked in the driveway.

69.   In or about January 2018, CBP Officer Jose Rodriguez and FBI SA Trayvon Barnes were contacted by a former employee of Lee name Hai Jin Lee, who wanted to provide information to the FBI about Lee.  Hai Jin Lee provided law enforcement with documents that included a colored folio sheet titled "Bullet Series;" a green colored folded document labeled "Best Sexual Enhancements" on one side and "3D Tubes" on the other side with

both sides containing images of products known to this investigation such as "Rhino," "Casanova," and "King Kung;" and a "Certificate of Liability Insurance" listing the insured as "Hasim Distribution, Inc., Dalee Supply, 8251 La Palma Ave., #376, Buena Park, CA 90620." Hai Jin Lee stated that she was recruited to work with Daniel Lee via a store in downtown Los Angeles and that Daniel Lee gave Hai Jin Lee $1,000 worth of pills to sell from which she could keep the proceeds above $1,000 to get her started. Hai Jin Lee stated that Lee used a warehouse at SUBJECT PREMISES 2 and a storage facility at SUBJECT PREMISES 1 and takes powder to a location in Gardena to be encapsulated. Hai Jin Lee provided 213-247-3348 as a phone number for Lee, and an address connected to Daniel Lee of 2045 Hetebrink Street, Fullerton, California. I know that 2045 Hetebrink Street, Fullerton, California is linked to a previous seizure by CBP of approximately 21.55 kilograms of bulk Sildenafil Citrate and 25.10 grams of bulk Tadalafil at the Federal Express facility in Memphis, Tennessee. The package was addressed to Nam Lee, 2045 Hetebrink Street, Fullerton, California, on or about October 30, 2016.

70. On January 31, 2018, at approximately 3:05 a.m., SA Pettigrew and I responded to SUBJECT PREMISES 6 and observed the Toyota Sienna van bearing CA license plate 7GKA567, registered to Lee, parked in the driveway.

71. On February 7, 2018, at approximately 5:48 a.m., I responded to SUBJECT PREMISES 6 and observed a single trash can in front of the residence and the Toyota Avalon (7VZK043),

38

registered to Nam Lee, parked in the driveway. At approximately 6:54 a.m., SA Iwanicki informed me that he drove by the residence and saw that the garage door was open and the Acura SUV bearing CA license plate 7RVN102, registered to Nguyen, was parked inside the garage. SA Iwanicki told me he observed an Asian male, possibly fitting the description of Lee, in the garage accessing the driver side car door of the Acura (7RVN102). At approximately 7:02 a.m., SA Iwanicki and I observed the Acura leave the residence.

72. On February 26, 2018, I again reviewed public records from the California Secretary of State website, Business Search section. I observed a Statement of Information, filed June 16, 2017, listing Hasim Distribution, Inc. as the corporate name, 8251 La Palma Avenue, #376, Buena Park, California as the street address for the principal executive office, and Lemuel Lee as the Chief Executive Officer (CEO), Secretary, Chief Financial Officer (CFO), Director, and Stan Park as the Agent for Service of Process. I observed a Statement of Information, filed October 26, 2017, listing Rainbow Natural Production, Inc. as the corporate name, 8251 La Palma Avenue, Unit 376, Buena Park, California as the street address for the principal executive office, and Lemuel Lee as the CEO, Secretary, CFO, Director, and Agent for Service of Process. I observed a Statement of Information, filed October 26, 2017, listing Dalee Supply, Inc. as the corporate name, 8251 La Palma Avenue #376, Buena Park, California as the street address for the principal executive office, and Lemuel Lee as the CEO, Secretary, CFO, and Director.

Lemuel Lee appears to be the 19 year-old adult male child of Lee.

73.  On March 16, 2018, at approximately 11:10 a.m., I responded to SUBJECT PREMISES 2 and observed the Toyota Sienna van bearing California license plates 7GKA567, registered to Lee, parked in the lot near the cul-de-sac. At approximately 11:12 am, I observed Nguyen leave SUBJECT PREMISES 2 and walk to another warehouse in the same complex and  open the door to 5241 Lincoln Avenue, #B6, Cypress, CA 90630 ("SUBJECT PREMISES 4") and walk inside. I observed Nguyen come out of SUBJECT PREMISES 4, get into the Toyota (7GKA567) and drive away. I followed the Toyota (7GKA567). At approximately 11:48 a.m., I observed the Toyota (7GKA567) arrive at SUBJECT PREMISES 3 and back up to the warehouse door at the back of the building. I observed Nguyen get out of the van and talk with an Asian male outside of the building.

74.  On March 26, 2018, at approximately 8:15 am, I responded to SUBJECT PREMISES 6 and observed the previously identified Toyota bearing CA license plate 7VZK043, registered to Lee, along with another vehicle, parked in the driveway.

75.  On March 27, 2018, I responded to SUBJECT PREMISES 2 and 4. At approximately 8:27 a.m., I observed a white SUV (plate and make/model not visible) backed up to the warehouse door of SUBJECT PREMISES 2 and an Asian male standing near the open rear lift gate of the SUV. I observed several Asian males carry two large plastic tubs from the rear of the SUV into the warehouse of SUBJECT PREMISES 2. At approximately the same

time, I observed another Asian male, walking in the parking lot, carrying 3 large blue bags with "Rhino" written in yellow lettering on them and into the warehouse door of SUBJECT PREMISES 2. At approximately 8:33 a.m., I observed the previously identified Acura (7WEP826) arrive with the rear of the vehicle full of cardboard boxes. At approximately 9:15 a.m., I observed an Asian male putting stacks of unused cardboard boxes into the Acura (7WEP826). At approximately 9:26 a.m., I observed the Acura (7WEP826) leave the parking lot of SUBJECT PREMISES 2 and 4, head West on Lincoln Avenue and drive into SUBJECT PREMISES 1. At approximately 9:45 am, I observed a white male driving a Prius (plate not visible) park near and enter the warehouse door of SUBJECT PREMISES 2. At approximately 10:00 a.m., I observed the same white male come out of SUBJECT PREMISES 2, walk to and enter the office door of SUBJECT PREMISES 4, and talk with a male inside.

76. On April 3, 2018, I responded to SUBJECT PREMISES 2 and 4. At approximately 9:14 a.m., I observed Nguyen wheel a cart, with cardboard and other boxes on it, from the direction of SUBJECT PREMISES 2 and take them inside the warehouse door of SUBJECT PREMISES 4. At approximately 9:18 a.m., I observed an Asian male at the warehouse door of SUBJECT PREMISES 4 talking with Nguyen. I observed Nguyen close and lock the door and walk with the Asian male back toward SUBJECT PREMISES 2. At approximately 9:20 a.m., I observed Nguyen walk back to the warehouse door of SUBJECT PREMISES 4, open the door, come out carrying a cardboard box, and walk back toward SUBJECT PREMISES

41

2.   At approximately 10:05 a.m., I observed Nguyen park the previously identified Toyota Sienna (7GKA567) next to the warehouse door of SUBJECT PREMISES 4, get out of the Toyota, and go inside the warehouse door of SUBJECT PREMISES 4.   Several minutes later, I observed Nguyen, along with two unidentified males, take boxes that appeared to be full, from inside the warehouse of SUBJECT PREMISES 4 and put them into the Toyota (7GKA567).

77.   On April 6, 2018, SA Robert Iwanicki and I responded to SUBJECT PREMISES 2 and 4.   At approximately 9:20 a.m., SA Iwanicki observed the previously identified Toyota Sienna van (7GKA567), driven by an Asian female with a male passenger wearing a baseball-style hat, park near the warehouse door to SUBJECT PREMISES 2.   SA Iwanicki then observed the Asian female and male carry cardboard boxes from inside the Toyota (7GKA567), into the warehouse door of SUBJECT PREMISES 2.   SA Iwanicki viewed into the open warehouse door of SUBJECT PREMISES 2 and observed blue or purple bags with "Rhino" in yellow lettering, that appeared to contain something, and multiple racks with shelves, three or four high, with stacks of packaged and assembled boxes for products similar to others seen on this case.   At approximately 9:25 a.m., SA Iwanicki and I observed the Asian male with the baseball-style hat open the office door of SUBJECT PREMISES 4, go inside and come out by opening the warehouse door of SUBJECT PREMISES 4.   At approximately the same time, SA Iwanicki told me he observed a white Toyota Camry (plate not visible), driven by an Asian male, arrive and park

42

near SUBJECT PREMISES 4. SA Iwanicki observed at least two purple or blue bags, that appeared to contain something, with yellow lettering on the sides, similar to those seen earlier in SUBJECT PREMISES 2 and at other times on this investigation, taken from the trunk of the Toyota Camry inside the warehouse door of SUBJECT PREMISES 4. At approximately 11:05 a.m., I observed the previously identified Toyota Sienna (7GKA567) driven by Nguyen park near the warehouse door of SUBJECT PREMISES 4. I observed Nguyen carry several cardboard boxes from inside the back of the Toyota (7GKA567) into the warehouse door of SUBJECT PREMISES 4. Shortly after, I observed Nguyen bring cardboard boxes, that appeared empty, out of the warehouse door of SUBJECT PREMISES 4 and stack them outside the door. Around this time SA Iwanicki walked by the open warehouse door of SUBJECT PREMISES 4 and observed purple or blue colored plastic cups, in plastic bags, that are used for holding capsules in the packaging similar to those previously seen on this investigation at the CBP exam warehouse. SA Iwanicki observed numerous cardboard boxes with white labels on them stacked on shelving systems that were three or four shelves high. SA Iwanicki observed one box on a shelve with a "libigrow" label on it. At approximately 11:15 a.m., I observed Nguyen close the warehouse door to SUBJECT PREMISES 4 and carry several large, gray plastic bins toward SUBJECT PREMISES 2. At approximately 11:23 a.m., I observed Nguyen walk back to the warehouse door of SUBJECT PREMISES 4, go inside for a short

43

time, and then close the door and drive away in the Toyota
Sienna (7GKA567).

78.   On April 6, 2018, at approximately 11:50 a.m., SA
Iwanicki observed the previously identified Acura (7RVN102),
driven by Nguyen, leave the parking lot of SUBJECT PREMISES 2
and 4 toward Right Space Storage, 8882 Watson Street, Cypress,
California.  SA Iwanicki responded to Right Space Storage, 8882
Watson Street, Cypress, CA 90630 and observed the Acura
(7RVN102) parked near and Nguyen inside unit #12.  SA Iwanicki
observed Nguyen sorting through various colors of the plastic
cups used for packaging.  Shortly after, SA Iwanicki returned to
the warehouse door of SUBJECT PREMISES 4 and walked by and took
photos of the boxes left outside by Nguyen.  SA Iwanicki
observed a stack of five to six cardboard boxes one with a label
"S&S International USA Inc., Description: HASIM non-woven bag;
QTY: 60 pcs/ct . . ."  and another with a label "Item number:
104, Name: plastic bottle, Quantity: 10,000 pcs."

79.   On April 13, 2018, at approximately 9:30 a.m., SA
Iwanicki and I responded to 9930 Pioneer Boulevard, Santa Fe
Springs, California ("SUBJECT PREMISES 5") and observed a Toyota
pickup bearing CA license plate 6Y57797, registered to Suyoung
Jung, 12318 160th Street, Norwalk, California parked nearby.  SA
Polk and I discovered SUBJECT PREMISES 5 during surveillance on
March 27, 2018 and March 29, 2018 watching a moving truck load
and take items such as boxes from 447 and 451 E. Gardena Blvd.,
Gardena, CA to SUBJECT PREMISES 5 and unload them.  The premises
at 447 and 451 E. Gardena Blvd., Gardena, CA was a previous

44

warehouse location used by Lee and his company Rainbow Natural
Production.  SA Polk observed some of the boxes inside SUBJECT
PREMISES 5 contained labels marked "Gelatin Empty Hard Capsules"
and "Kratom" along with "Mr. NAM HYUN LEE, 447 E. Gardena Blvd.,
Gardena, CA 90248."  SA Iwanicki and I observed an Asian male,
wearing a baseball-style hat, get tools from the bed of the
truck and take them inside SUBJECT PREMISES 5.  At approximately
9:45 a.m., SA Iwanicki and I observed an Asian male come out of
SUBJECT PREMISES 5 and get into a Toyota Prius bearing CA
license plate 8AFC112, registered to Michael Kim, 27114 Red
Cedar Way, Canyon Country, CA 91387, and drive away.  At
approximately 9:50 a.m., SA Iwanicki and I observed a van arrive
bearing CA license plate 7NGN239, driven by an Asian female,
park next to SUBJECT PREMISES 5.  SA Iwanicki and I observed the
Asian female take something into SUBJECT PREMISES 5 and then
come back out, through the pedestrian door, carrying a gray
plastic bin and put it into the van (7NGN239). The gray plastic
bin was similar to those recently seen at SUBJECT PREMISES 2 and
4.  At approximately the same time, SA Iwanicki and I observed
the Asian male wearing the baseball-style hat enter through the
warehouse door and come out through the pedestrian door.  At
approximately 9:54 a.m., SA Iwanicki and I observed the
previously identified Hyundai SUV (7YDR756), driven by an Asian
male park near SUBJECT PREMISES 5.  The driver of the Hyundai
(7YDR756) accessed the rear lift gate of the vehicle and then
moved the vehicle to a parking space in the lot.  Throughout the
surveillance, SA Iwanicki and I observed several construction

45

workers with tools and tool belts going in and out of SUBJECT
PREMISES 5.  At approximately 1:30 pm, SA Iwanicki and I, in an
undercover capacity, approached the open pedestrian door that is
part of one of the warehouse doors.  SA Iwanicki viewed inside,
from the parking lot, and observed an Asian female working with
conveyor belt equipment and machinery, cardboard boxes stacked
on the back wall, and machine parts around the room.

80.  On April 18, 2018, LAPD Det. Bradley Mossie and I
responded to SUBJECT PREMISES 6.  At approximately 6:45 a.m.,
Det. Mossie observed the garage door open and Lee put plastic
bags and a brown paper bag into the trash can.  Then, Det.
Mossie and I observed Lee bring the trash can out to the street.
At approximately 7:08 am, Det. Mossie and I observed a truck
from Republic Services, carrying a dumpster on the back, arrive
at the residence and an individual dump the contents of the
trash can into the dumpster.  At approximately 7:10 a.m., I
followed the Republic Services truck.  At approximately 7:45
a.m., Det. Mossie and I examined the contents of the dumpster
and found a partial spreadsheet that appeared to contain
inventory listings of products that are packaged and distributed
by Lee, including product names that I had previously observed
in an email, dated April 30, 2017, from Hasim Distribution at
hasimdistribution@yahoo.com to Michael/Hasim and Lee titled
"Subject: Price List," and containing an attachment titled
"Hasim Pricelist.xlsx."  The spreadsheet contained columns
titled "Name," "Status," "SUN," "Mon 02/12," "Tue 2/13," "Wed
02/14," "Thur," and "Fri."  Under the column "Name" we observed

"Crown (Black King)," "Crown (Black & Red)," "Crown (Purple
King)," and "Crown (Red King)." Under the column "Status" were
listed "Remain," "In," and "Out." The columns and rows
contained typed and handwritten numbers including a "Total" line
listing "129,600," "127,200," and "127,200." Det. Mossie and I
located a Chase Bank deposit slip, dated March 24, 2018,
containing check images of deposits of two checks, for $1,100
each, to "Lemuel Lee" from "Hasim Distribution, Inc." Wells
Fargo Bank account. In addition, we located adding machine
receipts adding numbers together and corresponding handwritten
figures of the same numbers on the backside of Bank of Hope
checking deposit slips.

81. On April 18, 2018, at approximately 10:45 am, SA
Iwanicki, Det. Mossie and I responded to SUBJECT PREMISES 5 and
observed the trash dumpsters nearby were very full. SA Iwanicki
and I went to one of the dumpsters and retrieved a silver foil
bag with a label "Silica Gel Desiccant" and a label "Rhino 69
Extreme 9000." We also found and retrieved a red capsule,
similar to others seen on this case, near the silver foil bag.

82. On April 20, 2018, I spoke with FDA-OCI SA Christopher
Walker, Dallas, Texas Office, concerning information he had
received, on April 19, 2018, during a convenience store
association meeting. SA Walker told me the board of directors
provided him with a letter that was given to them to validate
the sale of "Rhino" male enhancement products. The board of
directors told SA Walker the male individual selling the Rhino
products was an Asian male named "Jun" (NFI), with a business

47

"Premier Line Distribution."  SA Walker provided me a copy of
the letter titled "Certificate of Free Sale,"[7] which bears FDA
logos and claims in part to be "a true copy of material on file
in the Food and Drug Administration, Department of Health and
Human Services . . ."  The Certificate of Free Sale is dated
February 27, 2018, and states, in part, "[t]o Whom it May
Concern, Regarding: Rhino 7 Platinum 5000 (750mg), Hasim
Enterprise, 5241 Lincoln Ave., Ste B6, Cypress, CA 90630."
(SUBJECT PREMISES 4).  The document bears a signature and title
"Robert Durkin, Esq., M.S., R. Ph., Deputy Director, Office of
Dietary Supplement Programs, Center for Food Safety and Applied
Nutrition, U.S. Food and Drug Administration, By direction of
the Secretary of Health and Human Services."  I later learned
that on April 26, 2018, that FDA-OCI SA Larry Henderhan,
Cleveland, Ohio Office, had received similar "Certificate of
Free Sale" documents that mentioned HASIM, 5241 Lincoln Avenue,

---

[7] Firms exporting products from the United States are often asked
by foreign customers or foreign governments to supply export
certifications for products regulated by the FDA.  A Certificate
of Free Sale is a type of export certificate that FDA issues for
food, including dietary supplements. See FDA Export
Certificates, Guidance for Industry, available at
https://www.fda.gov/RegulatoryInformation/Guidances/ucm125789.ht
m).  To obtain a Certificate of Free Sale, the requestor
represents to FDA that the product for which it seeks a
Certificate of Free Sale is a dietary supplement, as defined by
the FDCA.  Dietary supplement manufacturers must comply with
numerous requirements before they can legally market their
products in the United States.  A Certificate of Free Sale does
not make a determination about the requestor's compliance with
such requirements as Certificates of Free Sale are issued by FDA
solely for export purposes.

Cypress, California while conducting interviews on a separate case.

83. I reviewed a Safe Deposit Box Lease Agreement, received from Wells Fargo Bank, listing March 29, 2018 as the original rental date, Lee as the customer, and SUBJECT PREMISES 6 as the mailing/billing address. The box number is listed as #11, the branch name as Cerritos, and the branch number as #04212. The agreement lists Lee as the "sole lessee", Lee's date of birth, driver license number and social security number, and telephone number (213) 247-3348. On May 11, 2018, I responded to Wells Fargo Bank, 13355 South St., Cerritos, CA 90703 ("SUBJECT PREMISES 7"), and spoke with a bank employee inside who confirmed the location is branch #04212. I know from my training and experience, and discussions with other law enforcement officers, that individuals attempting to hide their income, and other valuable assets, will utilize safe deposit boxes as a storage location. Safe deposit boxes can, for example, store cash, precious metals, jewelry, documents such as stock and bond certificates, and keys to other storage locations. As stated by multiple cooperating sources, Lee appears to conduct much of his business in cash transactions and my review of bank records has not uncovered what I believe to be the entirety of his income based upon my review of business documents such as invoices, information provided by sources, and Lee's email statement about the volume of product he produces monthly. Lee maintains at least two of his business bank accounts at Wells Fargo Bank.

84. On May 17, 2018, Robert Durkin, Esq., M.S., R.Ph.,
Deputy Director, Office of Dietary Supplement Programs, Center
for Food Safety and Applied Nutrition, FDA, provided me with
copies of labeling for "Rhino 7 Platinum 5000" provided to FDA
along with the "Food Export Certificate Application," dated
February 22, 2018, for manufacturer "Hasim Enterprise." I
reviewed the export certificate application, for the product
"RHINO 7 Platinum 5000," and observed it listed the contact
person as "Daniel Lee;" address as "5241 Lincoln Ave. Ste. B6
Cypress, CA 90630;" phone as "(909) 272-4184," and email as
"DALEESUPPLY@gmail.com." The verification statement states "the
undersigned verifies that all ingredients are approved for use
by FDA or appear on the GRAS[8] list, and each product is intended
for human consumption and is available for sale in the U.S.
without restriction." Durkin also provided me with a copy of
the label for "RHINO 7 Platinum 5000" that was submitted along
with the export certificate application. I reviewed the label
and observed it contained similar images and graphics to other
products on this investigation but without the claims seen on
other packaging. The label listed "Distributed by Hasim
Enterprise, LLC, 5241 Lincoln Ave., #B6, Cypress, CA 90630."

85. On May 22, 2018, I consulted with Dr. Arthur Simone,
Senior Medical Advisor, FDA Center for Drug Evaluation and
Research. I provided Dr. Simone with product packaging from the
undercover purchases made on March 30, 2017, as well as the FCC

---

[8] GRAS is Generally Recognized as Safe.

lab results.   Dr. Simone confirmed that these products are misbranded and unapproved new prescription drug products.

86.   On May 29, 2018, I obtained and reviewed files provided by FBI SA Brent James relating to a cooperating source ("CS3") who provided the FBI information on Lee.[9]   CS3 reported to the FBI, among other things, that s/he knows an individual named Daniel Lee who imports powder-form chemicals from China for the manufacture and wholesale trade of male sexual capsules. CS3 met Lee through a mutual acquaintance who worked for Lee, but quit because s/he felt used and betrayed by Lee.   CS3 stated that Lee's workshop is a warehouse in Buena Park, California. Everyday a delivery driver picks up and drops off product and materials at the warehouse.   Lee's girlfriend is Vietnamese and her family is likely involved in the manufacture of the drugs. Lee's customers fly in to Southern California from Texas, Atlanta, Sacramento, and other locations across the country to purchase from over 20 varieties of Lee's formula.   Product is shipped out every day under his company's name using UPS and FedEx.   Lee creates private-label products for individuals and sells product to companies on a branding agreement.   Business is

---

[9] CS3 is a source who claimed firsthand access to information about Lee.   The information that s/he provided to law enforcement has been corroborated. In 2009, CS3 was found guilty of misdemeanor hindering prosecution. In 2014, CS3 was charged with distribution of synthetic marijuana, pled guilty, and is awaiting sentencing.   In 2017, CS3 was charged with misdemeanor domestic assault 4th degree.   S/He cooperated with law enforcement with the hope of receiving a sentencing reduction.

primarily transacted in cash, which is moved overseas by Lee for
tax evasion purposes. At least some business is transacted in
checks. Lee is Korean and maintains a Bank of Hope (Korean
bank) account. Lee has an accountant named Michael (LNU) who
works 16-hour days handling Lee's accounting and bookkeeping,
including the payment system. Lee's business handles a large
amount of cash. Lee attended multiple conventions in Las Vegas,
Nevada, including the Champs Trade Show and ASD Convention,
displaying his products at the CBD booth. Lee met with
wholesalers at the booth during the 3-day ASD Convention and
made three million dollars in sales orders. Lee then returned
to California with over one million dollars in cash from sales
made to wholesalers.

87. On June 14, 2018, Robert Durkin, Esq., M.S., R.Ph.,
Deputy Director, Office of Dietary Supplement Programs, Center
for Food Safety and Applied Nutrition, FDA, provided me with
copies of labeling for "Rhino 69 Platinum 9000" provided to FDA
along with the "Food Export Certificate Application," dated
February 22, 2018, for manufacturer "Hasim Enterprise." The
export certificate application, for the product "RHINO 69
Platinum 9000," listed the contact person as "Daniel Lee;"
address as "5241 Lincoln Ave., Cypress, CA 90630;" phone as
"(909) 272-4184," and email as "DALEESUPPLY@gmail.com." The
verification statement stated "the undersigned verifies that all
ingredients are approved for use by FDA or appear on the GRAS
list, and each product is intended for human consumption and is
available for sale in the U.S. without restriction." Durkin

also provided me with a copy of the label for "RHINO 69 Platinum 9000" that was submitted along with the export certificate application.   I reviewed the label and observed it contained similar images and graphics to other products in this investigation but without the claims seen on other packaging. The label listed "Distributed by Hasim Enterprise, LLC, 5241 Lincoln Ave., #B6, Cypress, CA 90630" (SUBJECT PREMISES 4).

88.   On July 9, 2018, I reviewed a copy of entry documents submitted for a powder mixing machine and vacuum pump consigned to Dalee Supply Inc. 8251 La Palma Ave., #376, Buena Park, CA 90620 which I previously identified as a UPS Store mail box Lee uses and to which two shipments of bulk powder API were addressed that were seized by CBP.   This shipment was reviewed by CBP on June 29, 2018.   I observed that "Daniel Lee" and telephone "213-247-3348" was listed under the "Notify party" section.   I observed the proforma invoice listed items: "SBH-50 POWDER MIXER;" "VACUUM PUMP (USE IN SEMI AUTOMATIC CAPSULE FILLING MACHINE);" "00 CAPSULE PLATE (USE IN SEMI AUTOMATIC CAPSULE FILLING MACHINE);" "CAPSULE SWITCH (00 4 PCS AND 0 2 PCS);" "VACUUM PUMP (USE IN AUTOMATIC CAPSULE FILLING MACHINE)."

89.   On July 24, 2018, I responded to SUBJECT PREMISES 1. At approximately 10:05 a.m., I observed the previously identified Acura (7WEP826), driven by an Asian male, enter the storage facility gate.   At approximately 10:10 a.m., I observed the previously identified Dodge van (5N79234), driven by an Asian male, enter the storage facility gate.   At approximately 10:18 a.m., I observed the Dodge van (5N79234) leave the storage

facility. At approximately 10:31 a.m., I observed the Acura (7WEP826) leave the storage facility, head west on Lincoln Avenue, make a U-turn and head east, and then turn left into SUBJECT PREMISES 2 and 4.

90. On August 8, 2018, at approximately 6:10 a.m., I responded to SUBJECT PREMISES 6 and observed the previously identified Acura (7RVN102) and Toyota (7VZK043) parked in the driveway. I then observed a dump truck from Republic Services, arrive at the residence and the driver of the truck dump the contents of the trash can into the dumpster. I followed the Republic Services truck to 1131 N. Blue Gum Street, Anaheim, California, and I examined the contents of the dumpster. During my examination, I located the following: one exhibitor tag that read "ASD Show July 29 - August 1, 2018" "DANIEL LEE" "HASIM DISTRIBUTION Cypress, CA"; one yellow note paper with "HASIM" handwritten and "12807.05" and a signature; one adding machine slip with figures totaling "11,993.00"; two "JetBlue" boarding passes, dated August 1, 2018, from Las Vegas, Nevada to Long Beach, California, one for "NAM LEE" and one for "TUYET NGUYEN"; and one "Amazon Envelope" addressed to "LEMUEL LEE, 1515 W. Domingo Rd, Fullerton, CA 92833." On August 9, 2018, I conducted an online query and located "Hasim Distribution, Cypress, CA" with "Booth SL3214" listed as an exhibitor at the "2018 ASD Market Week August: Exhibitors."

91. On August 30, 2018, at approximately 1:20 p.m., I responded to SUBJECT PREMISES 3 and observed the pedestrian door was open and the previously identified Toyota Tundra (7F45737)

54

was parked near the door.  I observed multiple large card board boxes inside of the pedestrian door opening.

92.  On August 30, 2018, at approximately 2:10 p.m., I responded to SUBJECT PREMISES 5 and observed the previously identified Dodge van (5N79234) parked by the door.  I observed the previously identified Hyundai SUV (7YDR756) both parked in the parking lot.

93.  On September 5, 2018, LAPD Det. Bradley Mossie provided me with a surveillance log of surveillance activities conducted by LADP officers, dated August 28, 2018, for this investigation.  The log listed vehicles, individuals and activities of interest to the investigation.  Det. Mossie also provided some photos taken during surveillance on the same date as the log.  The log identified, among other vehicles, a white Dodge Ram Van, bearing CA license plate 15456M2, registered to Hasim Distribution Inc., 8251 La Palma, Buena Park, CA parked in the driveway at SUBJECT PREMISES 6.  The log also identified a black Cadillac SUV, bearing CA license plate 8DNK599, registered to Hasim Distribution Inc., 8251 La Palma, Buena Park, CA, that backed out of the garage of SUBJECT PREMISES 6 and was driven away by Lee.

94.  During my review of emails linked to Lee and obtained pursuant to a Federal search warrant, I reviewed 47 purchase orders, dated between August 2, 2016 and May 24, 2017, listing products Jacob's Paradise purchased from "Hasim Distribution, Daniel Lee, 8251 La Palma Ave., Ste. 376, Buena Park, CA 90620," for a total of $159,826.  Products listed on the purchase orders

included "Rhino 69," "Rhino 8," "King Kung," "Jaguar," "Tiger,"
"Black Stallion," and "OrgaZen."  I reviewed financial records
for Wells Fargo Bank account #7580060593, in the name of Hasim
Distribution, and observed deposits of 32 checks dated between
September 30, 2016 and March 30, 2018, from Jacob's Paradise,
payable to Hasim Distribution.  The total amount of the 32
deposits was approximately $130,229.   I reviewed financial
records for Bank of Hope account #6400344734, in the name of
Hasim Distribution Inc., and observed deposits of six checks
dated between May 15, 2017 and November 7, 2017, from Jacob's
Paradise, payable to Hasim Distribution.  The total amount of
the six deposits was approximately $36,282.00.

95.   I conducted online research of Jacob's Paradise and
found a website that sells products similar to those in this
investigation.  On January 10, 2018, FDA-OCI CCIU Analyst
Christopher Dunn provided me with 32 screen captures from the
website http://www.jacobsparadise.com/ listing male sexual
enhancement products for sale such as "OrgaZen," "libigrow,"
"King Kung," Rhino 69," "Rhino 8," and "Black Panther."

96.   I reviewed invoices and balance sheets, dated between
January 5, 2016 and August 19, 2016, obtained from Lee's email
accounts, regarding purchases made by "Calikulture," from Dalee
Supply and/or Hasim Distribution, for a total of $1,843,388.
Products listed on the invoices included "King Kung," "Rhino
69," "OrgaZen," "Black Stallion," "Rhino 8," "Rhino 7," and
"Black Cobra." I reviewed financial records from Wells Fargo
Bank account #7580060593, in the name of Hasim Distribution, and

observed deposits of ten checks dated between July 7, 2016 and
August 3, 2016, from "Limitless Trading Co., LLC DBA:
Calikulture," payable to Hasim Distribution.  The total amount
of the ten deposits was approximately $50,009.  I reviewed
financial records from Wells Fargo Bank account #7580060452, in
the name of Rainbow Natural Production Inc., and observed
deposits of 19 checks dated between March 21, 2018 and March 27,
2018, from "Limitless Trading Co., LLC DBA: Calikulture,"
payable to Rainbow Natural Production.  The total amount of the
19 deposits was approximately $92,737.50.  I was not able to
locate deposits for the remaining approximately $1.7 million
reflected on the invoices referenced above.

97.  I reviewed an email, dated August 16, 2016, from Sue
Quan at quan.sue@gmail.com to Lee at hasimdalee@gmail.com with a
subject "kevin han's invoice statement" and an attachment
"balance statement kevin han.pdf."  I reviewed the attachment
and observed 27 entries, with corresponding invoice numbers, on
a spreadsheet, dated between January 29, 2016 and July 22, 2016,
showing a "balance $201,199.00."  I reviewed an invoice from
Lee's email account, dated January 29, 2016, from "Dalee Supply"
to "Kevin Han" listing purchases of products such as "KingKung
Red," "KingKung Blue," "Black Stallion," "Rhino 69," and "Zebra"
for a total of $1,476.00.  The invoice listed "Paid Cash,
$1,800.00, January 31, 2016" and a "Balance -$324.00."

98.  I reviewed an email, dated September 1, 2016, from Sue
Quan at quan.sue@gmail.com to Nam Lee with "Subject: Balance
Statement for Dr Ken Issa," and an attachment with the same

57

name.  The email stated "Hi Daniel, Attached you will find Dr
Ken Issa's balance statement.  Please review and add missing
invoices. Thanks! Sue."  I reviewed the attachment and observed
"Florida Whole Sale," "Dr Ken Issa," and 24 entries on a
spreadsheet of invoices, dated between October 16, 2015 and
August 18, 2016, with the invoice totaling $255,142.50.

99.  I reviewed an email, dated March 8, 2017, from Michael
Kim at hasimmikek@gmail.com to zeebright@gmail.com, with Lee
cc'd to the email, with the subject "Classic Wholesale AR
Report."  The email had two attachments "Classic Wholesale AR
Report.pdf; Classic Wholesale Invoices - 20160923-20170221.pdf."
The email stated "Dear Shaun, Attached is your current balance
due for your account.  I have attached your invoice summary and
copies of the invoices.  Please review and clear the balance due
to release pending shipment."  I reviewed the "AR Report" and
saw that it listed "Classic Wholesale, Updated: March 7, 2017,"
and 7 invoices with a total of "$63,630.00" and "Paid $17,400
cash; $4,000 M/O."  I reviewed the invoices and observed
products such as "KingKung," "Rhino 7," "Rhino 12," "Rhino 25,"
and "Rhino 69."  I observed some of the invoices stated "Classic
Wholesale, 82 Alco Place, Baltimore, MD 21227" and most listed
either "Daniel Lee 213-247-3348" or "Hasim Distribution, Inc.
DBA Dalee Supply."

100. I reviewed an email, dated March 7, 2017, from Tae Lim
at alextaelim@gmail.com to rich1028lee@gmail.com;
hasimdalee@gmail.com; hasimmikek@gmail.com with attachments
"Richard Lee #1.pdf; Richard Lee #2.pdf; Richard Lee #3.pdf;

Richard Lee #4.pdf." I reviewed the attachments and saw 37 invoices, dated between February 26, 2016 and February 23, 2017, for a total of approximately $429,456.00. The invoices listed many products known to this investigation such as "Rhino 7," "OrgaZen," "Rhino 69," "Black Stallion," "Casanova," and "King Kung." Some of the invoices listed "Dalee Supply, (213) 247-3348," or "Daniel Nam Lee, (213) 247-3348," or "Hasim Distribution, 213-247-3348," or "Hasim Distribution, Inc., DBA Dalee Supply."

101. I reviewed financial records from Lee's accounts and observed approximately 67 checks deposited, between the dates March 29, 2017 and January 17, 2018, totaling approximately $422,033.50, from a company "Premier Sales Group." I observed deposits were often multiple checks on the same date, each check in amounts between $5,000 and $8,000.

102. I reviewed bank accounts linked to or controlled by Lee and/or his companies and observed the following:

    a. For Wells Fargo Bank Account #7580060593, which was opened in July 2016, I observed deposits of approximately $4,595,163.41 and withdrawals of at least $4,432,404.09 for the period of July 2016 to April 12, 2018. I observed that approximately $599,892.96 of the deposits were comprised of cash and approximately $163,407.09 were money orders.

    b. For Wells Fargo Bank Account #3621231665, in the name of Young H. Lee, I observed deposits of approximately $379,898.49 and withdrawals of at least $335,529.94 for the

period of approximately June 5, 2014 to April 11, 2018. I observed that approximately $202,814.04 of the deposits were comprised of cash and approximately $27,299.57 were money orders.

        c.    For Bank of Hope Account #6400344734, in the name of Hasim Distribution, I saw deposits of approximately $604,147.44 and withdrawals of approximately $395,805.09 for the period of May 23, 2017 to April 14, 2018.

        d.    For Bank of Hope Account #6400344017, in the name of Dalee Supply, I found deposits of approximately $1,817,963.80 and withdrawals of approximately $1,797,253.25 for the period of November 17, 2016 to April 16, 2018. I learned that at least $510,000.00 of the deposits were transfers or payments from Wells Fargo Account # 7580060593. Specifically, between approximately April 14, 2017 and April 28, 2017, $500,000 from Hasim Distribution Wells Fargo Account #7580060593 was deposited into Dalee Supply Bank of Hope Account #6400344017.

    103. I further reviewed emails that appeared to detail transactions between LEE and various distributers and packaging material suppliers, including the following emails:

        a.    An email, dated September 6, 2016, between LEE at hasimdalee@gmail.com and Kevin Han at kevinhanco@gmail.com, with a subject of "Re: payment history," listing "wells fargo cash," "bank of america cash deposit," "wells fargo bank cash deposit," and "chase bank cash deposit" between the dates of January 31, 2016 and August 27, 2016. The

email states "Total Amount $239,494.00." I reviewed cash deposits for Wells Fargo Bank Account #3621231665, in the name of Young H. Lee, and observed the 16 cash deposits in the Kevin Han email, "wells fargo cash deposit" between March 4, 2016 and June 13, 2016, match closely with the amounts and the dates of cash deposits into account #3621231665 for a total of $26,100.

b.     An email, dated March 17, 2017, from Michael Kim at hasimmikek@gmail.com to Stan Park and Nam Lee with a subject of "Wire Transfer Sent to China for Merchandises" and attachments "Hasim Distribution Wire Transfer – 2016.pdf." The email stated "Mr. Park, Attached are 5 wire transfers sent to China for total of $79,500." I reviewed the attachments and observed five wire transfers dated between July 18, 2016 and October 12, 2016, listing "Nam Hyun Lee" and "Hasim Distribution, Inc." as the originator and "Doohoo Intl Printing CO." as the beneficiary/recipient on four of the five wire transfers.

104. I know from my training and experience that subjects of unapproved new drug (whether or not characterized as dietary supplements) importation, manufacturing and distribution investigations utilize e-mail as a method of communication to place orders, coordinate shipments and deliveries, and to conduct other related business practices.

105. I know from my training and experience that subjects of unapproved new drug investigations (whether or not characterized as dietary supplements) often utilize storage facilities to store their illicit products prior to distribution

61

to the retail market.  I also know from my training and experience that subjects of these types of investigations will move business locations periodically, utilize a variety of addresses and individuals to receive shipments on their behalf, change bank accounts and deal in cash transactions, and change company and product names at various times to hide their operations from government regulatory inspection and law enforcement.

106. Through my training and experience, I am aware that illegal products purchased from foreign countries and territories (including China and Hong Kong) and shipped to the United States are often purchased using the Internet via a digital device, such as a computer or mobile telephone.  These purchases often take place via e-mail, text message, or other electronic means.

107. Through my training and experience, I am aware that illegal products purchased in the United States are often purchased using the Internet via a digital device, such as a computer or mobile telephone.  These purchases often take place via e-mail, text message, or other electronic means.

### VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

108. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart

phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise,

63

scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

        d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not

actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For

example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.

67

A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.   In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

109. As discussed herein, based on my training and experience I believe that digital devices will be found during the search.   Specifically, during my investigation I reviewed numerous emails in Lee's email accounts that indicated the use of mobile devices.   For example, I reviewed an email from Wells Fargo Online to namlee52@gmail.com, dated August 6, 2016, stating "your new card number has been updated to your mobile device."   The email listed an "Apple Pay iPhone," "Samsung Pay Galaxy Note5," and "Apple Pay Nam's iPad."   I reviewed an email from PayPal at service@paypal.com to Lee, dated November 11, 2016, stating "Hello Nam Lee, You've chosen to skip login with PayPal One Touch when making purchases from this device: Desktop Chrome Windows 10 NT 10.0."   I reviewed an email from Google no-reply@accounts.google.com to NamLee52@gmail.com, dated October 12, 2016, stating "Hi Nam, Your Google Account namlee1958@gmail.com was just used to sign in on iPhone."   I reviewed an email from Google no-reply@accounts.google.com to NamLee52@gmail.com, dated July 20, 2016, stating "Hi Nam, Your Google Account namlee1958@gmail.com was just used to sign in on

LG V10." I reviewed an email from Google no-
reply@accounts.google.com to NamLee52@gmail.com, dated May 29,
2016, stating "Hi Nam, Your Google Account namlee1958@gmail.com
was just used to sign in on Samsung Galaxy Note 5." I reviewed
an email from Google no-reply@accounts.google.com to
NamLee52@gmail.com, dated May 9, 2017, stating "Hi Nam, Your
Google Account rainbownatural2@gmail.com was just used to sign
in on SM-T580." I searched online and believe "SM-T580" is a
"Samsung Galaxy" tablet device. I expect to find laptop
computers, as they have been seen during surveillance and by CS3
inside SUBJECT PREMISES 2. In addition, I know Lee has a cell
phone and utilizes it for text messages and phone calls. I also
know that cell phone customers typically upgrade their cell
phones to newer models every few years due to damage or newly
available technology advances. Based upon the above
information, I expect to find Apple iPhones and other Apple
devices as well as devices utilizing Google or Microsoft
operating systems such as Samsung products.

110. I know from my training and experience and my review
of publicly available materials that several hardware and
software manufacturers offer their users the ability to unlock
their devices through biometric features in lieu of a numeric or
alphanumeric passcode or password. These biometric features
include fingerprint-recognition, face-recognition, iris-
recognition, and retina-recognition. Some devices offer a
combination of these biometric features and enable the users of

69

such devices to select which features they would like to utilize.

111. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard. Fingerprint-recognition features are increasingly common on modern digital devices. For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint. The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

112. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. To activate the facial-recognition feature, a user must hold the device in front of his or her

70

face.  The device's camera analyzes and records data based on

the user's facial characteristics.  The device is then

automatically unlocked if the camera detects a face with

characteristics that match those of the registered face.  No

physical contact by the user with the digital device is

necessary for the unlock, but eye contact with the camera is

often essential to the proper functioning of these facial-

recognition features; thus, a user must have his or her eyes

open during the biometric scan (unless the user previously

disabled this requirement).  Several companies produce digital

devices equipped with a facial-recognition-unlock feature, and

all work in a similar manner with different degrees of

sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017)

and Note8 (released Fall 2017), Apple's iPhone X (released Fall

2017).  Apple calls its facial-recognition unlock feature "Face

ID."  The scan and unlock process for Face ID is almost

instantaneous, occurring in approximately one second.

113. While not as prolific on digital devices as

fingerprint- and facial-recognition features, both iris- and

retina-scanning features exist for securing devices/data.  The

human iris, like a fingerprint, contains complex patterns that

are unique and stable.  Iris-recognition technology uses

mathematical pattern-recognition techniques to map the iris

using infrared light.  Similarly, retina scanning casts infrared

light into a person's eye to map the unique variations of a

person's retinal blood vessels.  A user can register one or both

eyes to be used to unlock a device with these features.  To

activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward
the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition
features.  In addition, Microsoft has a product called "Windows
Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, e.g.,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

114. In my training and experience, users of electronic
devices often enable the aforementioned biometric features
because they are considered to be a more convenient way to
unlock a device than entering a numeric or alphanumeric passcode
or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

115. I also know from my training and experience, as well
as from information found in publicly available materials
including those published by device manufacturers, that
biometric features will not unlock a device in some
circumstances even if such features have been enabled.  This can
occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with

72

Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.  I do not know the passcodes of the devices likely to be found during the search.

116. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in

73

my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require Lee, Nguyen, and Michael Kim to unlock a device found at a SUBJECT PREMISES using biometric features in the same manner as discussed in the following paragraph, as long as Lee, Nguyen, or Michael Kim are reasonably believed by law enforcement to be a user of the device.

117. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to biometric sensor-enabled devices reasonably believed by law enforcement to be used by Lee, Nguyn, or Michael Kim, that is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located at the SUBJECT PREMISES and (b) falls within the scope of the warrant: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are

74

authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

118. As outlined previously, I believe Lee utilizes and has access to a variety of different devices such as laptops, desktops, cell phones of different make and model, as well as tablets of different make and model. I am not aware of how many devices will be present at each site or whether they are connected by a local area network ("LAN"). I believe there may be a number of digital devices present at the search locations, using a variety of software operating systems. In addition, I have reviewed emails containing foreign language text such as Korean which could complicate the review of data and the time it takes. Additionally, one of the search locations is a residence at which if there is a large volume of digital information present, an onsite search could delay the timeframe in which control of the residence could be returned to the occupants. Based upon my training and experience, most businesses and people use multiple computers and mobile devices and so I expect we will find multiple devices at each location. Additionally, it is common to hide and/or encrypt data on these devices, which would require the devices to be transported off site so a more thorough search can be conducted. Furthermore, certain devices might require specialized and/or proprietary software and

75

hardware in order to access the data, which would make an onsite search impossible.

119. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## IX.   CONCLUSION

120. For all the reasons described above, there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 331(a) (Introduction or Delivery for Introduction of a Drug that is Misbranded), 331(d) (Introduction or Delivery for Introduction of an Unapproved New Drug into Interstate Commerce), and Title 18, United States Code Sections 371 (Conspiracy), 542 (Entry of Goods by Means of False Statements), and 545 (Smuggling Goods into the United States), and 1001 (False Statements), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES 1-7, as further described above and in Attachments A-1 through A-7 of this affidavit.

_____
David J. Aspling
Special Agent
U.S. Food and Drug
Administration,
Office of Criminal
Investigations

Subscribed to and sworn before

me on October ____ , 2018.

_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE